EXHIBIT

3



MICHAEL P. KOHLER

Direct Dial 404-962-6403
Direct Fax 404-962-6303
michael.kohler@millermartin.com

## NOTICE OF BREACH OF CONTRACT

January 24, 2025

**Via FedEx & Email**

Walker County
P.O. Box 445
101 South Duke Street
LaFayette, Georgia, 30728
Attn: Chairman Shannon Whitfield

Walker County Development Authority
P.O. Box 445
101 South Duke Street
LaFayette, Georgia, 30728

Email: commissioner@walkerga.us
l.brooks@walkerga.us
development@walkerga.us

Walker County, Georgia:

You may recall we represent Audia Group, LLC ("Audia").

On December 12, 2024, Audia exercised its right under the September 10, 2014 Real Estate Option Agreement ("Option Agreement") to purchase (for $10.00) the "Option Property" as defined by the September 10, 2014 Agreement for Purchase and Sale of Property (the "Purchase Agreement"). Attached is a copy of the December 12 letter exercising the real estate option.

In accordance with Section 7 of the Option Agreement, Audia requested that Walker County provide an updated Option Property Survey that complies with ALTA/ASCM minimum standards. The deadline to provide the updated survey was **January 13, 2025**. We haven't received the updated survey. Walker County, therefore, is in breach of the Option Agreement.

Audia demands that Walker County cure this breach by immediately providing an Updated Option Property Survey that complies with ALTA/ASCM minimum standards. The updated survey should be delivered to my office no later than **Wednesday, February 5, 2025**. Audia further demands that Walker County strictly comply with the Purchase Agreement and Option Agreement, including, but not limited to: (1) conveying "good and marketable fee simple title to the Option Property to [Audia] free and clear of all liens and encumbrances" on the **April 13, 2025** closing date; (2) making the Option Property "pad ready" (as defined under Section 8

Regions Plaza Suite 2100
1180 West Peachtree Street, N.W. | Atlanta, GA | 30309-3407
Office 404 962 6100 Fax 404 962 6300
millermartin.com

**ATLANTA**
**CHARLOTTE**
**CHATTANOOGA**
**NASHVILLE**

Walker County
Walker County Development Authority
January 24, 2025
Page 2

of the Option Agreement) on or by **March 12, 2025**; and (3) providing Audia "update reports on a weekly basis, such reports to include pictures of the work completed," in making the Option Property "pad ready," which we have received none to date.

Please confirm in writing (email is fine) by close of business **Friday, January 31, 2025** (the "Deadline"), that Walker County will strictly comply with the Option Agreement and Purchase Agreement, including, but not limited to, that it will (1) deliver the required updated survey by **February 5, 2025**; (2) make the Option Property "pad ready" by **March 12, 2025**; (3) provide weekly reports to Audia on the status of making the Option Property "pad ready;" and (4) close on the Option Property on **April 13, 2025**.

If we do not receive confirmation from Walker County by the Deadline that it will strictly comply with the Option Agreement and Purchase Agreement, then it's clear that Walker County has no intention of complying with its obligations under the Option Agreement and Purchase Agreement, and Audia will consider Walker County's refusal to comply as a repudiation of the agreements. To be clear, Audia rejects any repudiation or renunciation of the Option Agreement or Purchase Agreement, and Audia will hold Walker County to the strict terms of the agreements, including seeking Walker County's specific performance under the agreements and reimbursement of Audia's attorneys' fees and litigation costs for having to do so.

This is not an invitation to negotiate.

Audia reserves all rights under the Purchase Agreement, Option Agreement, and the law.

Regards,

Michael P. Kohler

MPK/gl
Attachment
cc:    David D. Gottlieb, Esq. (d.gottlieb@walkerga.us)
       Ryan Christy, Esq.
       Mary-Jo Rebelo, Esq.
       Thomas Harrold, Esq.



**MICHAEL P. KOHLER**

Direct Dial 404-962-6403
Direct Fax 404-962-6303
michael.kohler@millermartin.com

## NOTICE OF EXERCISING REAL ESTATE OPTION

December 12, 2024

**Via FedEx & Email**

Walker County
P.O. Box 445
101 South Duke Street
LaFayette, Georgia, 30728
Attn: Chairman Shannon Whitfield

Walker County Development Authority
P.O. Box 445
101 South Duke Street
LaFayette, Georgia, 30728

Email: commissioner@walkerga.us
l.brooks@walkerga.us
development@walkerga.us

Walker County, Georgia:

We represent Audia Group, LLC ("Audia"). As you are aware, Audia and Walker County and Walker County Development Authority are parties to: (1) an Agreement for Purchase and Sale of Property dated September 10, 2014 (the "Purchase Agreement"); and (2) a Real Estate Option Agreement dated September 10, 2014 (the "Option Agreement"). Copies of both the Purchase Agreement and the Option Agreement are attached for your reference.

**Exercising of Option**. In accordance with Section 3 of the Option Agreement, this will confirm that Audia is exercising its option to purchase (for $10.00) the "Option Property" (as defined by the Purchase Agreement). The proposed closing date is **Monday, April 13, 2025**, *i.e.*, no less than 120 after the effective date of this notice. Option Agr. § 3. At closing, Walker County "shall convey good and marketable fee simple to the Option Property to [Audia] free and clear of all liens and encumbrances[.]" Option Agr. § 4.

**Updated Survey**. In accordance with Section 7 of the Option Agreement, Audia requests that Walker County (at its expense) provide an updated Option Property Survey that complies with ALTA/ASCM minimum standards. The updated survey must be provided within 30 days of this notice, *i.e.*, **Monday, January 13, 2025**. Option Agr. § 7.

**Pad Ready**. In accordance with the Option Agreement, Walker County (at its expense) must satisfy several conditions prior to the April 13, 2025 closing, including making the Option

Walker County
Walker County Development Authority
December 12, 2024
Page 2

Property "pad ready." Option Agr. § 8(f). Among other things: (1) the Option Property must be "rough-graded and fine-graded, and meeting the soil compaction, soil composition, flatness and other specifications established by [Audia's] general contractor or engineer;" (2) the Option Property must have "proper storm water management facilities, including retention ponds, pellet separation systems, drainage connections[,] . . . and loading dock drains, in place;" (3) "all required railway bed construction and ballasting for the railway service . . . completed and ready for installation of the contemplated rail spur, including rail track, switches and other equipment;" (4) "appropriate concrete foundation for truck docks to be located on the Option Property;" and (5) "the topsoil scrapped off and collected in an area determined by [Audia] for subsequent use[.]" Option Agr. § 8(f). Enclosed is the conceptual layout of Audia's anticipated future facility on the Option Property.

Walker County is reminded that as it prepares to make the Option Property "pad ready," it must provide Audia "update reports on a weekly basis, such reports to include pictures of the work completed[.]" *Id.*

Walker County's obligation to make the Option Property "pad ready," among its other pre-closing conditions, must be satisfied within 90 days of this notice, *i.e.*, **Wednesday, March 12, 2025.** Option Agr. § 8(j). "Time shall be of the essence of this [Option] Agreement and each and every term and condition hereof." Option Agr. § 15(j). If Walker County does not complete any portion of the work needed to deliver the Option Property "pad ready" prior to closing, Walker County "shall remain obligated to complete such work (at its expense) post-Closing." Option Agr. § 8(f). We nonetheless trust Walker County will deliver the Option Property "pad ready" by the April 13, 2025 closing date.

Please contact me if you have any questions. Audia reserves all rights under the Purchase Agreement, Option Agreement, and the law.

Sincerely,

Michael P. Kohler

MPK/gl
Enclosures
cc:    David D. Gottlieb, Esq. (d.gottlieb@walkerga.us)
       Ryan Christy, Esq.
       Mary-Jo Rebelo, Esq.
       Thomas Harrold, Esq.





MICHAEL P. KOHLER

Direct Dial 404-962-6403
Direct Fax 404-962-6303
michael.kohler@millermartin.com

## NOTICE OF EXERCISING REAL ESTATE OPTION

December 12, 2024

**Via FedEx & Email**

Walker County
P.O. Box 445
101 South Duke Street
LaFayette, Georgia, 30728
Attn: Chairman Shannon Whitfield

Walker County Development Authority
P.O. Box 445
101 South Duke Street
LaFayette, Georgia, 30728

Email: commissioner@walkerga.us
l.brooks@walkerga.us
development@walkerga.us

Walker County, Georgia:

We represent Audia Group, LLC ("Audia"). As you are aware, Audia and Walker County and Walker County Development Authority are parties to: (1) an Agreement for Purchase and Sale of Property dated September 10, 2014 (the "Purchase Agreement"); and (2) a Real Estate Option Agreement dated September 10, 2014 (the "Option Agreement"). Copies of both the Purchase Agreement and the Option Agreement are attached for your reference.

**Exercising of Option.** In accordance with Section 3 of the Option Agreement, this will confirm that Audia is exercising its option to purchase (for $10.00) the "Option Property" (as defined by the Purchase Agreement). The proposed closing date is **Monday, April 13, 2025**, *i.e.*, no less than 120 after the effective date of this notice. Option Agr. § 3. At closing, Walker County "shall convey good and marketable fee simple to the Option Property to [Audia] free and clear of all liens and encumbrances[.]" Option Agr. § 4.

**Updated Survey.** In accordance with Section 7 of the Option Agreement, Audia requests that Walker County (at its expense) provide an updated Option Property Survey that complies with ALTA/ASCM minimum standards. The updated survey must be provided within 30 days of this notice, *i.e.*, **Monday, January 13, 2025**. Option Agr. § 7.

**Pad Ready.** In accordance with the Option Agreement, Walker County (at its expense) must satisfy several conditions prior to the April 13, 2025 closing, including making the Option

Regions Plaza Suite 2100
1180 West Peachtree Street, N.W. | Atlanta, GA | 30309-3407
Office 404.962.6100 Fax 404.962.6300
millermartin.com

ATLANTA
CHARLOTTE
CHATTANOOGA
NASHVILLE

Walker County
Walker County Development Authority
December 12, 2024
Page 2

Property "pad ready." Option Agr. § 8(f). Among other things: (1) the Option Property must be "rough-graded and fine-graded, and meeting the soil compaction, soil composition, flatness and other specifications established by [Audia's] general contractor or engineer;" (2) the Option Property must have "proper storm water management facilities, including retention ponds, pellet separation systems, drainage connections[,] . . . and loading dock drains, in place;" (3) "all required railway bed construction and ballasting for the railway service . . . completed and ready for installation of the contemplated rail spur, including rail track, switches and other equipment;" (4) "appropriate concrete foundation for truck docks to be located on the Option Property;" and (5) "the topsoil scrapped off and collected in an area determined by [Audia] for subsequent use[.]" Option Agr. § 8(f). Enclosed is the conceptual layout of Audia's anticipated future facility on the Option Property.

Walker County is reminded that as it prepares to make the Option Property "pad ready," it must provide Audia "update reports on a weekly basis, such reports to include pictures of the work completed[.]" *Id.*

Walker County's obligation to make the Option Property "pad ready," among its other pre-closing conditions, must be satisfied within 90 days of this notice, *i.e.*, **Wednesday, March 12, 2025.** Option Agr. § 8(j). "Time shall be of the essence of this [Option] Agreement and each and every term and condition hereof." Option Agr. § 15(j). If Walker County does not complete any portion of the work needed to deliver the Option Property "pad ready" prior to closing, Walker County "shall remain obligated to complete such work (at its expense) post-Closing." Option Agr. § 8(f). We nonetheless trust Walker County will deliver the Option Property "pad ready" by the April 13, 2025 closing date.

Please contact me if you have any questions. Audia reserves all rights under the Purchase Agreement, Option Agreement, and the law.

Sincerely,

Michael P. Kohler

MPK/gl
Enclosures
cc: David D. Gottlieb, Esq. (d.gottlieb@walkerga.us)
Ryan Christy, Esq.
Mary-Jo Rebelo, Esq.
Thomas Harrold, Esq.

POTENTIAL WETLAND AREA PER N.W.I.

POTENTIAL WETLAND AREA PER N.W.I.

PROPOSED RAIL SPURS

EXISTING RAIL SIDING

PLANNED FUTURE PARK ROADWAY

POTENTIAL WETLAND AREA PER N.W.I. (TO BE MITIGATED PRIOR TO CONSTRUCTION)



AUDIA

1115'

900'

1930'

1880'

WALKER COUNTY INDUSTRIAL DRIVE

ELECTRIC SUB-STATION





WALKER COUNTY, GEORGIA

## EARTHWORK

CUT: 1,172,000± C.Y.
FILL: 4,560± C.Y.
SOIL EXPORT: 1,167,000± CY
FINISHED FLOOR ELEV: 900 FT

EARTHWORK EST.: $ 11,400,000±
TOPSOIL REMOVAL: $ 344,000±
SOIL EXPORT COST: $21,060,000± -
$24,600,000±

TOTAL COST: $32,808,000± -
$36,344,000±

## LEGEND

POTENTIAL WETLAND AREA NATIONAL WETLANDS INVENTORY

EXISTING TOPOGRAPHY

PROPOSED TOPOGRAPHY

NOTE:

1. THE BOUNDARY INFORMATION SHOWN ON THIS DRAWING WAS TAKEN FROM TAX MAP INFORMATION AND SHOULD NOT BE ASSUMED TO BE CORRECT.

2. PROPOSED SITE LAYOUT IS CONCEPTUAL AND SHOULD BE UTILIZED WITH CAUTION, UNDER NO CIRCUMSTANCE SHOULD THIS DRAWING BE UTILIZED FOR PERMITTING AND / OR SITE CONSTRUCTION.

SCALE IN FEET
120    0    120    240    360

THIS DOCUMENT IS THE PROPERTY OF THE GEORGIA POWER COMPANY

DO NOT MODIFY, DISTRIBUTE OR REPRODUCE WITHOUT THE CONSENT OF THE GEORGIA POWER COMPANY

THIS DOCUMENT IS INTENDED FOR ESTIMATING PURPOSES ONLY AND NOT INTENDED FOR CONSTRUCTION AND/OR PERMITTING

WALKER COUNTY BUSINESS PARK
CONCEPTUAL LAYOUT

LAFAYETTE, GA
WALKER COUNTY



Georgia Power

Community and Economic Development
75 Fifth Street N.W., Suite 150
Atlanta, Georgia 30308



| JOHNSON | JUN-15-23 |
| JOHNSON | JUN-15-23 |
| JOHNSON | LAFAYETTE |
| AS SHOWN | WALKER |

00

CONCEPTUAL

Microsoft Bing

(c) 2023 Microsoft Corporation  © 2023 Maxar  ©CNES (2023) Distribution Airbus DS  Earthstar Geographics SIO  © 2023 TomTom

## AGREEMENT FOR PURCHASE
## AND SALE OF PROPERTY

THIS AGREEMENT is made and entered into as of this __10TH__ day of __SEPTEMBER__ 2014, by and between AUDIA GROUP, LLC, a PENNSYLVANIA LIMITED LIABILITY COMPANY ("Buyer"), and  WALKER COUNTY, GEORGIA and WALKER COUNTY DEVELOPMENT AUTHORITY (collectively, "Seller").

## WITNESSETH THAT:

WHEREAS, Seller currently owns the Property (as hereinafter defined) and the Option Property (as hereinafter defined), both of which are located within the Park (as hereinafter defined).

WHEREAS, Buyer wishes to purchase, and Seller wishes to sell, the Property (as hereinafter defined), but only upon the terms and conditions hereinafter set forth.

WHEREAS, contemporaneous with the purchase of the Property, Buyer also wishes to obtain an option to purchase the Option Property, and Seller wishes to provide to Buyer an option to purchase the Option Property, on the terms and conditions hereafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

Section 1.  Definitions and Exhibits.

1.1  Definitions.  For purposes of this Agreement, each of the following terms, when used herein with an initial capital letter, shall have the meaning ascribed to it as follows:

Agreement.  This Agreement for Purchase and Sale of Property.

Business Day.  Monday through Friday, excluding bank holidays and legal holidays recognized by the state government of the State of Georgia.

Closing.  The closing and consummation of the purchase and sale of the Property and the granting of the option for the purchase and sale of the Option Property pursuant hereto.

1

Closing Date. The date on which the Closing occurs as provided in Section 9.1 hereof.

Contract Date. The date upon which this Agreement shall be deemed effective, which shall be the date first above written.

Environmental Matter. Any matter or circumstance related in any manner whatsoever to (i) the disposal or release of solid, liquid or gaseous waste into the environment, (ii) the treatment, storage disposal or other handling of any Hazardous Substance, (iii) above-ground or underground storage tanks used for the storage of petroleum, petroleum products, or Hazardous Substances, or (iv) the presence of any Hazardous Substance, including, but not limited to, asbestos, in any building, structure or workplace, which matter or circumstance exists at the Property on or before the Closing Date.

Environmental Reports. Existing environmental site assessments, remediation reports, tank removal reports and other reports (including, but not limited to, any soils and groundwater assessments and reports) for the Property, the Option Property, or the Park.

Hazardous Substances. Any and all hazardous, extremely hazardous, or toxic substances or wastes or constituents as those terms are defined by any applicable Hazardous Substance Law (including, without limitation, CERCLA and RCRA) and petroleum, petroleum products, asbestos or any asbestos-containing materials, the group of organic compounds known as polychlorinated biphenyls (PCBs), flammables, explosives, radioactive materials, and chemicals known to cause cancer or reproductive toxicity.

Hazardous Substance Law. Any and all federal, state, or local laws, rules, regulations, ordinances, agency or judicial orders and decrees, and agency agreements now and hereafter enacted or promulgated or otherwise in effect, relating to the protection of the environment, including, without limitation, the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§6901 et seq., the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. §6901, et seq., the Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq., the Clean Air Act, 42 U.S.C. §§7401 et seq., the Toxic Substances Control Act, 15 U.S.C. §§2601 et seq., and the Safe Drinking Water Act, 42 U.S.C. §§300f et seq., and all amendments, regulations, orders and decrees promulgated thereunder or pursuant thereto.

Option Property. Those estates, tracts or parcels of land being more generally depicted on Exhibit "A-1" attached hereto, and by these references made a part hereof, all buildings, improvements and other structures thereon and all easements appurtenant thereto, together with all of Seller's right, title and interest as it relates to the Option Property in and to all easements, utility reservations, rights of way, strips and gores of land, mineral rights, water and

2

12187661v8 27324-0001

water rights, wells, well rights and permits, water and sewer taps, sanitary or storm sewer capacity or reservations, rights under utility agreements with any applicable governmental or quasi-governmental entities or agencies with respect to the providing of utility services to such real property, tenements, hereditaments, privileges, licenses and appurtenances, reversions and remainders in any way belonging, remaining or appertaining thereto, together with all improvements, fixtures, personal property, trees, timber, other crops and plants and minerals located thereunder or thereon, and if and to the extent transferable, all general intangibles relating to the any of the aforesaid including, but not limited to all contracts, agreements, trade names, warranties, guarantees, licenses, permits, plans, specifications, maps, plats, surveys, and governmental approvals and consents relating thereto.

Park. The Walker County Business Park.

Permitted Title Exceptions. Those matters affecting title to the Property or the Option Property which are acceptable to Buyer in its sole discretion.

Person. Any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or government (whether national, Federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

Property. Those estates, tracts or parcels of land being more generally depicted on Exhibit "A-1" attached hereto, and by these references made a part hereof, all buildings, improvements and other structures thereon and all easements appurtenant thereto, together with all of Seller's right, title and interest as it relates to the Property in and to all easements, utility reservations, rights of way, strips and gores of land, mineral rights, water and water rights, wells, well rights and permits, water and sewer taps, sanitary or storm sewer capacity or reservations, rights under utility agreements with any applicable governmental or quasi-governmental entities or agencies with respect to the providing of utility services to such real property, tenements, hereditaments, privileges, licenses and appurtenances, reversions and remainders in any way belonging, remaining or appertaining thereto, together with all improvements, fixtures, personal property, trees, timber, other crops and plants and minerals located thereunder or thereon, and if and to the extent transferable, all general intangibles relating to the any of the aforesaid including, but not limited to all contracts, agreements, trade names, warranties, guarantees, licenses, permits, plans, specifications, maps, plats, surveys, and governmental approvals and consents relating thereto.

Proration Date. The effective date of the prorations provided in Section 4.2 hereof, which is midnight on the eve of the Closing Date.

Purchase Price. The purchase price for the Property described in Section 4.1 hereof.

3

Title Insurer. A national title insurance company selected by Buyer.

1.2  Exhibits. Attached hereto and forming an integral part of this Agreement are the following exhibits, all of which are incorporated into this Agreement as fully as if the contents thereof were set out in full herein at each point of reference thereto:

Exhibit A-1 -  Depiction of Property and Option Property

Exhibit A-2 – INTENTIONALLY OMITTED

Exhibit B -  Form of Certificate and Affidavit of Non-Foreign Status

Exhibit C -  Form of Affidavit of Seller's Residence

Exhibit D -  Form of Seller's Affidavit Regarding Brokers

Exhibit E -  Form of Deed

Exhibit F -  Form of Option Agreement

Section 2. Purchase and Sale Agreement. Subject to and in accordance with the terms and provisions hereof, Seller agrees to sell, assign and convey to Buyer, and Buyer agrees to purchase from Seller, the Property.

Section 3. Option Grant. Contemporaneous with, and subject to, the purchase and sale of the Property, Seller shall grant to Buyer an option ("Option") to purchase the Option Property pursuant to an Option Agreement substantially in the form attached hereto as Exhibit F.

Section 4. Purchase Price and Prorations.

4.1  Purchase Price. The purchase price (the "Purchase Price") for the Property shall be Ten and No/100 Dollars ($10.00). The Purchase Price, as adjusted by the prorations provided in Section 4.2 hereof, shall be paid by Buyer to Seller at the Closing in United States dollars, by wire transfer or other immediately available funds.

4.2  Prorations. The following items shall be prorated between Seller and Buyer as of the Proration Date, and prorations favoring Buyer, to the extent determinable as of the Proration Date, shall reduce the amounts payable by Buyer at the Closing, and such prorations favoring Seller, to the extent determinable as of the Proration Date, shall increase the amounts payable by Buyer at the Closing:

4

12187661v8 27324-0001

4.2.1    The Property is exempt from state, county, city or other ad valorem property taxes and assessments (the "Taxes"). Therefore Taxes shall not be prorated.

4.2.2  Sanitary sewer taxes and utility charges, if any.

4.2.3    Association dues, assessments or other charges, if any, under any declarations, covenants or easements affecting the Property.

If the parties make any errors or omissions in the closing prorations or if they subsequently determine any dollar amount prorated to be incorrect, each agrees, upon notice from the other after the Closing, to make any adjustment necessary to correct the error, including payment of any amount to the other then determined to be owing. The terms and conditions set forth in this Section 4.2 shall expressly survive the Closing hereunder for one (1) year after the Closing Date.

Section 5. Title to the Property. Seller shall convey good and marketable fee simple title to the Property to Buyer free and clear of all liens and encumbrances (including, but not limited to, any loans secured by the Property), subject only to the Permitted Title Exceptions. Seller shall remove any monetary liens against the Property at or before the Closing. Seller agrees not to further alter or encumber or convey in any way Seller's title to the Property after the Contract Date without Buyer's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

Section 6. Survey. Seller, at Seller's expense, shall cause a surveying company licensed under the laws of the state where the Property is located and reasonably approved by Buyer, to prepare a current plat of survey of the Property (the "Survey") and of the "Option Property" (the "Option Property Survey"). The Survey and the Option Property Survey shall comply with ALTA/ASCM minimum standards (an ALTA survey) and shall be subject to Buyer's written approval which will not be unreasonably withheld, conditioned or delayed. The legal description to be attached to the Deed and to the deed conveying the Option Property if Buyer exercises the Option shall be the legal description of the Property or the Option Property, as applicable, prepared from the Survey.

Section 7. Buyer's Inspection, Conditions Precedent.

7.1 Physical Inspection. Buyer and its agents, employees, representatives and independent contractors are and have been entitled to enter upon the Property and the Option Property for the purpose of making such surveys, soil tests, borings, percolation tests, inspections, examinations, and studies as Buyer deems necessary or desirable in its sole discretion regarding the Property and the Option Property. Buyer agrees to exercise such right in a manner that will not materially and adversely harm or damage the Property or the Option Property, or interfere with Seller's operations being conducted thereon. Buyer agrees to restore the Property and the Option Property to their condition prior to any such work immediately after conducting the same. Buyer hereby indemnifies and holds Seller harmless from and against any claims for injury or death to

5

persons, damage to property or other losses, damages or claims, including, in each instance, reasonable attorneys' fees and litigation costs actually incurred, arising out of any action of any person or firm entering the Property or Option Property on Buyer's behalf as aforesaid, which indemnity shall survive the Closing or any termination of this Agreement; provided, however, this indemnity shall not apply to Buyer's mere discovery of any pre-existing condition (including, without limitation, any Hazardous Substances) at the Property or the Option Property. Buyer's obligation to restore the Property and Option Property as provided in this Section 7.1 shall survive any termination of this Agreement.

7.2 <u>Document Inspection</u>. Seller represents and warrants that it has delivered to Buyer (or will deliver to Buyer within five (5) days after the date of this Agreement) true, correct and complete copies of each of the following items to the extent in Seller's possession or control:

7.2.1 <u>Notices</u>. All notices of a violation of any law or regulation (including, without limitation, Hazardous Substance Laws) with respect to the Property, the Option Property, or the Park (or any portion thereof) or with respect to the exercise by such authority of the right of condemnation or eminent domain;

7.2.2 <u>Seller's Title Insurance</u>. Copies of any title insurance policies affecting the Property or the Option Property in Seller's possession;

7.2.3 <u>Environmental Reports</u>. All Environmental Reports in Seller's possession;

7.2.4 <u>Permits</u>. Any permits affecting the Property or the Option Property in Seller's possession;

7.2.5 <u>Geotechnical Surveys</u>. All existing geotechnical surveys of the Property, the Option Property, or the Park in Seller's possession;

7.2.6 <u>Miscellaneous</u>. Such other documents and information regarding the Property or the Option Property as Buyer may have reasonably requested. From and after the Contract Date, and to the extent in Seller's possession or control, Seller agrees to provide Buyer with such further documents and information regarding the Property or the Option Property as Buyer may request from time to time.

7.3 <u>Conditions Precedent for Buyer.</u> In addition to other conditions set forth in this Agreement for Buyer's benefit, Buyer's obligation to purchase the Property shall be subject to and contingent upon the following conditions precedent, any or all of which Buyer may waive by written notice only:

7.3.1 <u>Adverse Conditions</u>. There shall be no material adverse change in the condition of or affecting the Property or the Option Property between the Contract Date and the

6

Closing Date, including, but not limited to, (a) environmental contamination, (b) access, and (c) the availability, adequacy and cost of utilities;

7.3.2 <u>Title Insurance.</u> The willingness of Title Insurer to issue, on the Closing Date, upon the sole condition of the payment of an amount no greater than its regularly scheduled premium and delivery of items required of Buyer, its standard ALTA form owner's policy of title insurance ("Title Policy"), insuring in the amount of at least $50,000,000 that title to the Property is vested of record in Buyer on the Closing Date, subject only to the Permitted Title Exceptions;

7.3.3 <u>Survey.</u> The Survey and the Option Property Survey not disclosing any matters that are objectionable to Buyer in its sole discretion;

7.3.4 <u>Representations and Warranties.</u> Seller's representations and warranties contained herein shall be true and correct as of the Contract Date and the Closing Date in all material respects.

7.3.5 <u>Estoppel.</u> Buyer shall have received an estoppel certificate from the appropriate Person with respect to any covenants, conditions, restrictions, or easements which affect the Property confirming (i) that the Property is not in default under any of such covenants, conditions, restrictions, or easements, (ii) that there are no past due amounts owed with respect to the Property, and (iii) addressing such other matters as Buyer may reasonably request.

7.3.6 <u>Pad-Ready.</u>

(a)    Seller having the Property, at its expense, rendered "pad-ready" by contractors approved by Buyer. As used herein, "pad-ready" means in a final condition upon which Buyer's contractors can commence construction of the current and future contemplated facilities on the Property, including without limitation (1) having the proposed facility locations (including all buildings and the trailer truck and automobile parking areas) as shown of the Buyer's site plan rough-graded and fine-graded, and meeting the soil compaction, soil composition, flatness and other specifications established by Buyer's general contractor or engineer; (2) proper storm water management facilities, including retention ponds, pellet separation systems, drainage connections (to be located within five feet of the proposed building location and the number of which to be determined by Buyer's general contractor), and loading dock drains, in place, (3) all required railway bed construction and ballasting for the railway service contemplated in Section 7.3.11 below completed and ready for installation of the contemplated rail spur, including rail track, switches and other equipment, (4) appropriate concrete foundation for a truck weighing scale to be located on the Property, (5) appropriate concrete foundation for the truck docks to be located on the Property, (6) appropriate concrete foundation for the railway scale to be located on the Property, and (7) the topsoil scraped off and collected in an area determined by Buyer for subsequent use by Buyer's designated contractor in landscaping the Property. In rendering the Property pad-ready, the contractor selected by Seller

7

12187661v8 27324-0001

will consult with Buyer and its general contractor and/or engineers to ensure the Property is prepared in a manner consistent with Buyer's construction plans. When Seller believes the Property is pad-ready, Seller will cause its engineer or contractor to certify to Buyer that the Property is pad-ready as defined herein. Buyer shall also have the right to inspect and test the Property, using such independent parties as it deems advisable, to confirm that it is pad-ready as defined herein. To the extent that, by agreement of the parties, Seller does not complete any portion of the foregoing work prior to the Closing, Seller shall remain obligated to complete such work (at its expense) post-Closing.

(b)    With respect to the Option Property, Seller may undertake such site work consistent with the requirements for the preparation of the Option Property set forth in the Option Agreement, in its sole discretion and at its sole option and expense. To the extent that Seller elects to undertake any such site work, Seller shall install on the Option Property proper erosion control mechanisms as necessary to maintain the integrity of the Option Property and as required by law.

(c)    Seller will provide to Buyer update reports on a weekly basis, such reports to include pictures of the work completed and to be in a form to be mutually agreed upon by the parties.

7.3.7  Water, Sewer, Electricity, Natural Gas, Etc.

(a)    Seller will ensure to Buyer's satisfaction that, prior to their transfer to Buyer, both the Property and the Option Property have access, within five (5) feet of Buyer's facilities, to applicable water and sewer lines (for both Buyer consumption and fire suppression systems) sewer lines (sanitary and storm water) natural gas lines, and telecommunication lines. Water and sewer lines shall have respective minimum capacities of (a) for consumption, 82,000 gallons per day, and (b) for fire suppression, 3000 gallons per minute. With respect to electricity, Seller shall have entered into an agreement satisfactory to Buyer with Georgia Power Company ("Georgia Power") to construct, at no charge to Buyer, a substation within the confines of the Walker County Business Park (the site to be mutually agreed upon by Seller and Georgia Power), to provide the necessary easements to allow the running of power lines from Georgia Power's existing Georgia Power lines to the substation, and from the substation to the Property and the Option Property; such electric lines shall be capable of delivering electricity up to at least twelve (12) megawatts to both sites. Seller will agree with Georgia Power to contribute $800,000 to these electricity-related improvements, with Georgia Power agreeing to pay any expenses in excess of $800,000 (subject to the terms of a separate agreement between Georgia Power and Buyer regarding committed electricity usage). With respect to natural gas, Seller will ensure to Buyer's satisfaction that, prior to transfer to Buyer, both the Property and Option Property have access to applicable natural gas lines, as described above, with a minimum capacity of 40 MM BTU per hour peak load usage. Finally, with respect to telecommunications, Seller will ensure to Buyer's satisfaction that, prior to transfer to Buyer, both the Property and Option Property

8

12187661v8 27324-0001

have access to telecommunications lines with sufficient capacity to provide adequate telephone and internet service to support Buyer's contemplated business operations.

(b)    Seller will ensure that all necessary temporary utility connections (including without limitation water and electricity) necessary to complete the construction related activities prescribed herein and the construction of the contemplated facilities are available.

7.3.8    Tax Abatement. Seller providing to Buyer 100% ad valorem property tax abatement on the Property and the building and personal property to be constructed and installed thereon. Such abatement must commence upon transfer of the Property to Buyer and continue until the issuance of a certificate of occupancy for the to-be-constructed manufacturing facility and for ten (10) years thereafter. Upon expiration of the abatement period, the real and personal property will be subject to ad valorem property tax in accordance with Walker County's then current policies and procedures. To facilitate the implementation of the herein-referenced incentives from Seller to Buyer, including but not limited to the property tax abatement, Buyer and Seller will enter into a sale-leaseback bond transaction. Under this sale-leaseback transaction, Buyer shall pay to Seller the following fees and costs based upon the value of the bonds and/or the economic incentive being provided by the County; a total transaction fee of 1/8 of 1% of the total county incentive value (agreed to be $ 67,500.00 ), a bond issuance fee (underwriter/advisor/investment banker) equal to One Dollar ($1.00) per bond, and will reimburse Seller for its total counsel fee, including bond counsel, local counsel, and any special needed counsel, equal to Three Dollars ($3.00) per bond.

7.3.9    Traffic, Parking and Roadway Improvements. Seller designing, developing and constructing within the Park such public roadways as necessary to provide proper and sufficient roadway access to the Property and the Option Property, including a dedicated roadway encompassing the facilities to be located on the Property and the Option Property (to include curbing and sidewalks around the facilities, and roadways between rail lines as necessary), and appropriate parking areas at the Property and the Option Property dedicated to automobile and truck traffic associated with Buyer's business. The roadways and parking areas (which may be covered, at Buyer's expense) shall be of concrete and/or asphalt construction, and shall be constructed to such specifications as Buyer reasonably believes are necessary to accommodate the contemplated traffic and parking to and around the facilities. Such construction shall include, without limitation, appropriate concrete reinforcement of rail lines, whether located inside or outside Buyer's facilities, including all intersections of roadways and rail track, and the roadway between the rail lines and along the outside of the outermost rail line (from the building).

Furthermore, Seller will design and develop such traffic improvements necessary to improve the ingress/egress from the Property and the Option Property to the existing public roadways adjacent to the Park, including working with the Georgia Department of Transportation to have installed a traffic light on such public roadway.

9

7.3.10  ⅃ )GE Grant.  Buyer obtaining a $200,000 EDGE Grant from the State of Georgia. Selle₁ a ₃rees to provide all reasonable assistance required by Buyer to obtain such grant.

7.3.11  Railway Service. Buyer obtaining from Chattooga & Chickamauga Railway and such other railway company acceptable to Buyer, a signed commitment to install on the Property and Option Property rail spurs, including track, switches and other equipment, necessary to provide to the Property and the Option Property adequate rail service in Buyer's opinion to support its business operations. Seller will provide all reasonable assistance requested by Buyer in identifying, pursuing, and obtaining third party funds to finance such portion of the costs of the contemplated railway improvements not paid by the railway company.

7.3.12  Failure of Condition(s) Precedent; Cancellation.  If any of the foregoing conditions precedent in this Section 7.3 are not satisfied or waived in writing by Buyer, Buyer shall elect, at its option, by notice to Seller, either to:  (a) terminate this Agreement, in which event the parties hereto shall have no further rights or obligations hereunder, except for those which expressly survive such termination; or (b) close without regard to the failure of such condition.  If these conditions have not been satisfied by December 1, 2014, within thirty (30) days thereafter, Buyer shall elect either option (a) or (b) by notice to Seller. If Buyer does not give any such notice to Seller, Buyer shall be deemed to have elected option (a).

7.3.12  Inspections; Safety Precautions; Erosion Control .  So long as this Agremeent is in force, Buyer shall be entitled to visit and inspect the Property and the pre-closing work to be performed by Seller, subject to Seller's established safety procedures.  Seller will ensure that, in performing all of the various construction-related services required hereunder, all proper and legally–required erosion control and safety precautions are implemented, including proper barricading of all excavation and active construction sites. Seller shall also construct all temporary roadways necessary to complete the contemplated construction activities (both pre and post-closing), as well as to allow Buyer to inspect such work and the results thereof, and all required temporary walk-off, washout, and storage areas.

7.4  Conditions Precedent for Seller.  In addition to other conditions set forth in this Agreement for Seller's benefit, Seller's obligation to convey the Property shall be subject to and contingent upon the following conditions precedent, any or all of which Seller may waive by written notice only:

7.4.1  Buyer committing (i) to construct and equip a new manufacturing facility at the Property with an estimated cost of approximately $54,000,000, and (ii) to employ at the new facility a minimum of 75 full-time employees within five (5) years after issuance of the certificate of occupancy and for the balance of the tax abatement period under 7.3.8.  To the extent Buyer fails to meet such investment and employment commitments, the agreement will give Seller the right to pursue a pro rata clawback of the tax incentives provided - the terms of

10

12187661v8 27324-0001

such clawback to be set forth in the sale-leaseback bond documents contemplated in Section 7.3.8 above.

Section 8. Representations and Warranties. Seller hereby warrants and represents to Buyer as of the date hereof as follows:

8.1 Notices. Seller has no knowledge of, and has not received any notice of any pending or threatened violation, action or proceeding by any organization, person, individual or governmental agency against Seller with respect to or against the Property or the Option Property (or any portion thereof), and, to the best of Seller's knowledge, there is no current threat of any litigation or other legal action being filed against Seller, the Property or the Option Property which would affect the Property, the Option Property or Seller's ability to perform its obligations hereunder. Seller has not received any notice alleging that the Property or the Option Property is not in compliance with any applicable law, statute, code, rule, regulation, or ordinance.

8.2 Title to the Property. Seller owns good and marketable fee simple title to the Property and the Option Property, there is no pending litigation or dispute, and Seller has received no written notice of any disputes, concerning the title to the Property or the Option Property, and Seller has not been served with any legal action concerning the title to the Property or the Option Property.

8.3 Authority. Seller is a political subdivision duly organized, validly existing and in good standing under the laws of the State of Georgia.   Seller is not subject to any voluntary or involuntary proceeding for dissolution or liquidation.   Seller has obtained all requisite authorizations and consents to enter into this Agreement with Buyer and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the other agreements and instruments referred to herein and the consummation of the transactions contemplated hereby by Seller will not violate, nor constitute a default any law, charter, document, instrument, agreement or any order or ruling of any governmental authority or court by which Seller, the Property, or the Option Property may be bound. This Agreement is the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms.   The entities and individuals executing this Agreement and the other documents and instruments referenced herein or otherwise executed and delivered in connection herewith on behalf of Seller have the legal power, right and authority to bind Seller under the terms and conditions stated herein.

8.4 Reserved.

8.5 Undisclosed Agreements and Liabilities. Other than as expressly set forth in this Agreement, there are no undisclosed liabilities or agreements affecting the Property, the option Property, or Seller, in its capacity as owner of the Property and the Option Property, that will be binding on Buyer, the Property, or the Option Property.

11

12187661v8 27324-0001

8.6  No Rights to Purchase.  To Seller's knowledge, no Person, other than Buyer, has any right, agreement, commitment, option, right of first refusal or any other agreement, whether oral or written, with respect to the purchase, assignment or transfer of all or any portion of the Property or the Option Property.

8.7  Taxes and Assessments.  The Property and the Option Property are not subject to or affected by any state, county, city or other ad valorem property taxes or assessment.

8.8  Environmental Matters.

(a)  Hazardous Substances have not been used, generated, transported, treated, stored, released, discharged or disposed of in, onto, under or from the Property or the Option Property by Seller or, to the best of Seller's knowledge, by any predecessor-in-title or by any other Person at any time.  To Seller's knowledge, the Property and the Option Property are not in violation of any Hazardous Substance Laws.  Seller has received no written or oral notice or other communication of pending or threatened claims, actions, suits, proceedings or investigations against Seller, the Property, the Option Property, or any occupant of the Property or Option Property related to alleged or actual violations of Hazardous Substance Laws.

(b)  To Seller's knowledge, no written notification of release of a Hazardous Substance has been filed as to the Property or the Option Property, nor, to the best of Seller's knowledge, is the Property, the Option Property or any property in the immediate vicinity of the Property or Option Property listed or formally proposed for listing on the National Priority List promulgated pursuant to CERCLA or on any other Federal or state list of Hazardous Substance sites requiring investigation or cleanup.

(c)  To the best of Seller's knowledge, there are no above-ground or underground tanks or any other underground storage facilities located on the Property or the Option Property.

8.9  Subdivision.  To Seller's knowledge, both the Property and the Option Property constitute, or at Closing will constitute,  separately subdivided, legally distinct parcels of land in compliance with all applicable laws, ordinances, regulations, statutes, rules and restrictions pertaining to and affecting the Property or Option Property which relate to such subdivision.

8.10  No Condemnation.  There is no pending or threatened condemnation, expropriation, eminent domain, change in grade of public street or similar proceeding affecting all or any portion of the Property or Option Property; Seller has received no written or oral notice of the same; and Seller has no knowledge that any such proceeding is contemplated.

8.11  Covenants, Conditions, Restrictions or Easements.  To Seller's knowledge, there is no default or breach by Seller or any other party thereto, under any covenants, conditions, restrictions, or easements which may affect the Property or the Option Property or any portion or

12

portions thereof which are to be performed or complied with by the owner of the Property or the Option Property. All amounts, if any, due from Seller under any such covenants, conditions, restrictions or easements have been paid in full.

8.12 <u>No Bankruptcy</u>. Seller is not a party to any voluntary or involuntary proceedings in bankruptcy, reorganization or similar proceedings under the Federal bankruptcy laws or under any state laws relating to the protection of debtors, or subject to any general assignment for the benefit of the creditors, and, to the best of Seller's knowledge, no such action has been threatened.

8.13 <u>No Leases</u>. There are no tenants of the Property or the Option Property and no person or entity now has, or at the time of Closing will have, any possessory interest in the Property or the option Property, under a lease or otherwise.

8.14 <u>No Service Contracts</u>. There are no contracts or agreements for service to, or maintenance or operation of, the Property for which Seller will be responsible after the Closing Date.

8.15 <u>No New Encumbrances</u>. From and after the Contract Date until the date and time of the Closing, Seller shall not convey any portion of the Property or the Option Property or any rights therein, or enter into any conveyance, security document, easement or other agreement, or amend any existing agreement, granting to any Person (other than Buyer) any rights with respect to the Property or the Option Property or any part thereof or any interest whatsoever therein, without Buyer's prior written consent, which may be granted or withheld in Buyer's sole discretion.

8.16 <u>Non-Foreign Status; Withholding</u>. Seller is not a "foreign person" as that term is defined in the Internal Revenue Code of 1986, as amended and the Regulations promulgated pursuant thereto and the sale of the Property is exempt from O.C.G.A. §48-7-128. Seller's sale of the Property is not subject to any Federal, state or local withholding obligation of Buyer under the tax laws applicable to Seller or the Property.

8.17 <u>No Landfill</u>. Seller has not used the Property or option Property as a landfill, dump or stump pit, and to the best of Seller's knowledge, the Property and Option Property have never been so used.

8.18 <u>Access</u>. The Property and Option Property have, or as of the Closing shall have, direct, immediate and uninterrupted ingress, egress and access to and from a public right-of-way and, to Seller's actual knowledge, there is no current threat of any action which would affect the access to the Property or the Option Property.

8.19 <u>Flood Plain</u>. To Seller's actual knowledge, no portion of the Property or Option Property is located in any flood plain.

13

12187661v8 27324-0001

The foregoing representations in this Section 8 are true, correct and complete in all material respects, shall be true correct and complete in all material respects as of the Closing Date and shall survive the Closing for one (1) year and shall not be deemed merged into any instrument of conveyance delivered at the Closing, and shall inure to the benefit of and be enforceable by Buyer, its successors and assigns.

Section 9. Closing.

9.1 Time and Place. Provided that all of the conditions set forth in this Agreement are theretofore fully satisfied or performed, the Closing shall be held at the office of Miller & Martin PLLC, at 10:00 a.m. local time, on a date selected by Buyer which shall be on or before December 31, 2014, unless the Closing Date is postponed pursuant to the express terms of this Agreement or as otherwise agreed by Seller and Buyer in writing. If Buyer is not satisfied with the conditions precedent set forth in Section 7.3, Buyer may extend the Closing Date for up to sixty (60) days by giving written notice thereof to Seller. The parties agree to cooperate to close in escrow by mail if possible.

9.2 Closing Documents. For and in consideration of, and as a condition precedent to Buyer's delivery to Seller of the Purchase Price, Seller shall obtain and deliver to Buyer at the Closing the following documents (all of which shall be duly executed and witnessed, which documents Buyer agrees to execute where required):

9.2.1 A limited warranty deed (the "Deed") conveying to Buyer all of Seller's right, title and interest in and to the Property, subject only to the Permitted Title Exceptions, in the form attached as Exhibit "E" hereto and by this reference made a part hereof;

9.2.2 A Certificate and Affidavit of Non-Foreign Status in the form attached as Exhibit "B" hereto and by this reference made a part hereof;

9.2.3 An affidavit of title in the form reasonably required by the Title Insurer in order to issue its extended coverage owner's policy of title insurance without exception for mechanic's, materialmen's or other statutory liens, for unrecorded easements, for other rights of parties in possession or for other matters that are unacceptable to Buyer;

9.2.4 Such evidence as Title Insurer shall reasonably require as to the authority of the parties acting on behalf of Seller to enter into this Agreement and to discharge the obligations of Seller pursuant hereto;

9.2.5 A certificate of Seller, dated as of the Closing Date, reaffirming that all representations and warranties of Seller under this Agreement are true, correct and complete in all material respects as of the Closing Date which certificate shall survive the Closing for one (1) year.

14

12187661v8 27324-0001

9.2.6 A Closing Statement;

9.2.7. Such further instructions, documents and information as Buyer or Title Insurer may reasonably request to consummate the purchase and sale contemplated by this Agreement.

9.2.8 An Affidavit of Seller's Residence in the form attached as Exhibit "C" hereto and by this reference made a part hereof;

9.2.9 A Seller's Affidavit Regarding Brokers in the form attached hereto as Exhibit "D" hereto and by this reference made a part hereof;

9.2.10 An Option Agreement substantially in the form attached hereto as Exhibit "F" hereto and by this reference made a part hereof; and

9.2.11 At Closing, Seller will also deliver to Buyer all licenses, permits, plans, specifications, maps, plats, surveys, books and records in Seller's possession or control relating to the Property or to the operation or use thereof.

9.3 Reserved

9.4 Costs. At the Closing, Seller and Buyer shall pay their own respective costs incurred with respect to the consummation of the purchase and sale of the Property as contemplated herein, including, without limitation, attorneys' fees. Notwithstanding the foregoing, it is expressly agreed that Seller shall pay the cost of any and all transfer and/or documentary stamp taxes (if any) incident to the conveyance of title to the Property to Buyer. Buyer shall pay the cost of recording the deed, any title insurance commitment or title insurance policy that Buyer elects to obtain, and any costs, fees or expenses relating to Buyer's investigation of the Property.

Section 10. Environmental Indemnity. If the Closing occurs, Seller shall indemnify and hold harmless Buyer from any and all claims, losses, Liabilities, damages, deficiencies, diminution in value, costs, and expenses, including reasonable attorneys' fees and the expenses of investigation and defense (whether or not involving third party claims) incurred or sustained by Buyer, directly or indirectly, as a result of, in connection with or arising out of (i) any violation or alleged violation of any Hazardous Substance Law with respect to the Property or the Option Property occurring on or before the Closing Date. This Section 10 shall expressly survive the Closing hereunder.

Section 11. Condemnation.

11.1 Condemnation. Upon becoming aware of the same, Seller agrees to give Buyer immediate written notice of any actual or threatened taking in condemnation or by eminent domain (or a sale in lieu thereof). Between the Contract Date and the Closing Date, any actual or

15

12187661v8 27324-0001

threatened taking or condemnation for any public or quasi-public purpose or use by any competent authority in appropriate proceedings or by any right of eminent domain of all or any part of the Property or the Option Property which would, in Buyer's judgment, adversely affect the Property or Option Property or render either unsuitable for Buyer's purposes, shall, at Buyer's option, allow Buyer, by written notice to Seller, to elect to terminate this Agreement. If this Agreement is so terminated, the parties shall have no further rights or obligations hereunder, except for those which expressly survive any such termination. Notwithstanding the foregoing, between the Contract Date and the Closing Date, Seller agrees not to institute any taking in condemnation or by eminent domain (or a sale in lieu thereof) related to the Property or the Option Property.

11.2  Awards and Proceeds.  If Buyer does not elect to terminate this Agreement following any notice of a threat of taking or taking by condemnation, as provided above, this Agreement shall remain in full force and effect and the conveyance of the Property contemplated herein, less any interest taken by eminent domain or condemnation, or sale in lieu thereof, shall be effected. At the Closing, Seller shall assign, transfer and set over to Buyer all of Seller's right, title and interest in and to any awards or payments for the actual value of the property lost or destroyed that have been or may thereafter be made for any such taking or sale in lieu thereof.

Section 12.  Assignment.  Buyer may assign any of Buyer's rights hereunder or any part thereof to an affiliate or subsidiary of Buyer or to an entity formed by Buyer for the purpose of taking title to the Property.  Otherwise, Buyer may not assign Buyer's rights hereunder or any part hereof without the Seller's prior written consent shall not be unreasonably withheld, conditioned or delayed.

Section 13.  Brokers.  Buyer and Seller each warrant and represent to the other that they have not employed and will not employ, a real estate broker or agent in connection with the transaction contemplated hereby.  Each party agrees to indemnify and hold the other harmless from any loss or cost suffered or incurred by it as a result of the other's representation herein being untrue.  This Section 13 shall expressly survive the Closing hereunder.

Section 14.  Notices.  Wherever any notice or other communication is required or permitted hereunder, such notice or other communication shall be in writing and shall be delivered by hand, by nationally-recognized overnight express delivery service, by U. S. registered or certified mail, return receipt requested, postage prepaid, or by email, to the addresses set out below or at such other addresses as are specified by written notice delivered in accordance herewith:

BUYER:        Audia Group LLC
              450 Racetrack Road
              Washington, Pennsylvania 15301
              Attention: A. Richard Violi, Esq.
              Phone No.: (724) 745-0588

16

12187661v8 27324-0001

Email: violi@audiagroup.com

With a copy to:          Miller & Martin PLLC
                         1180 W. Peachtree Street NW
                         Suite 2100
                         Atlanta, Georgia 30309
                         Attention:  Charles A. Brake, Esq.
                         Phone No.:  (404) 962-6436
                         Email:  cbrake@millermartin.com


SELLER:                  _____
                         _____
                         _____
                         Attention:_____
                         Phone No.:_____
                         Email:_____

With a copy to:          Walker County Development Authority
                         P.O. Box 445
                         Lafayette, GA 30753
                         Attention:  Larry Brooks
                         Phone No.:  706-638-1437
                         Email:  l.brooks@walkerga.us


Any notice or other communication mailed as hereinabove provided shall be deemed effectively given (a) on the date of delivery, if delivered by hand; (b) on the date delivered if sent by overnight express delivery or if sent by U.S. mail; or (c) on the date of transmission, if sent by email.  Such notices shall be deemed received (a) on the date of delivery, if delivered by hand or overnight express delivery service; (b) on the date indicated on the return receipt if mailed; or (c) on the date of transmission, if sent by email.  If any notice mailed is properly addressed but returned because of a change of address for which no prior written notice was properly given, such notice shall be deemed to be effective notice and to be given on the date of mailing. If any notice is properly sent to an email address but returned because of a change of email address for which no prior written notice was properly given, such notice shall be deemed to be effective notice and to be given on the date the email was sent.

Section 15.  Miscellaneous.

15.1    Governing Law; Headings; Rules of Construction.    This Agreement shall be construed and interpreted under the laws of Georgia.  The titles of sections and subsections herein have been inserted as a matter of convenience of reference only and shall not control or

17

12187661v8 27324-0001

affect the meaning or construction of any of the terms or provisions herein. All references herein to the singular shall include the plural, and vice versa. The parties agree that this Agreement is the result of negotiation by the parties, each of whom was represented by counsel, and thus, this Agreement shall not be construed against the maker thereof.

15.2  No Waiver. Neither the failure of either party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with its obligations hereunder, nor any custom or practice of the parties at variance with the terms hereof shall constitute a waiver of either party's right to demand exact compliance with the terms hereof.

15.3  Entire Agreement. This Agreement and the documents incorporated herein by reference contain the entire agreement of the parties hereto with respect to the Property, and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein or incorporated herein by reference shall be of any force or effect.

15.4  Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective personal representatives, successors and assigns.

15.5  Amendments. No amendment to this Agreement shall be binding on any of the parties hereto unless such amendment is in writing and is executed by the party against whom enforcement of such amendment is sought.

15.6  Possession. Possession of the Property shall be granted by Seller to Buyer no later than the Closing Date, subject to the Permitted Title Exceptions.

15.7  Date for Performance. If the time period by which any right, option or election provided under this Agreement must be exercised, or by which any act required hereunder must be performed, or by which the Closing must be held, expires on a day other than a Business Day, then such time period shall be automatically extended through the close of business on the next regularly scheduled Business Day.

15.8  Reserved

15.9  Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which, when taken together, shall constitute but one and the same instrument. The parties agree to accept emailed copies of executed signature pages to this Agreement and to treat the same as originals. To the extent emailed copies of signature pages are used, upon request, the parties agree to exchange original signature pages promptly after the Effective Date.

15.10  Time of the Essence. Time shall be of the essence of this Agreement and each and every term and condition hereof.

12187661v8 27324-0001

15.11  <u>Severability</u>.  This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations, and is intended, and shall for all purposes be deemed to be, a single, integrated document setting forth all of the agreements and understandings of the parties hereto, and superseding all prior negotiations, understandings and agreements of such parties.  If any term or provision of this Agreement or the application thereof to any person or circumstance shall for any reason and to any extent be held to be invalid or unenforceable, then such term or provision shall be ignored, and to the maximum extent possible, this Agreement shall continue in full force and effect, but without giving effect to such term or provision.

15.12  <u>Listings and Other Offers</u>.  During the pendency of this Agreement, Seller shall not list the Property or the Option Property with any broker or otherwise solicit any offers to sell the Property or Option Property or enter into any binding contracts or binding agreements regarding any disposition of the Property or Option Property.

15.13  <u>Attorney's Fees</u>.  In the event a dispute arises between Buyer and Seller under this Agreement, the losing party shall pay the attorney's fees and court costs of the prevailing party.

19

12187661v8  27324-0001

IN WITNESS WHEREOF, each of the parties hereto has duly signed and sealed this Agreement, effective as of the day and year first above written.

SELLER:

WALKER COUNTY, GEORGIA

By: _Bebe Heiskell_
Name: _Bebe Heiskell_
Title: _Commissioner_

Attest: _Pamela W_
Name: _Pamela D Townsend_
Title: _Notary Public_

[Corporate Seal]

WALKER COUNTY DEVELOPMENT AUTHORITY

By: _Alvin M Hutchison_
Name: _Alvin M Hutchison_
Title: _Chairman_

Attest: _Pamela D Townsend_
Name: _Pamela D Townsend_
Title: _Notary Public_

[Corporate Seal]

20

12187661v8 27324-0001

BUYER :

AUDIA GROUP, LLC

By: _____

Name: RICHARD VIOLI

Title: VICE PRESIDENT & GENERAL COUNSEL

Attest: _____

Name: JAMES TODD GUNNERSBACH

Title: DIRECTOR

[Corporate Seal]

21

12187661v8 27324-0001

EXHIBIT "A-1"

**DEPICTION OF PROPERTY AND OPTION PROPERTY**

A-1

12187661v8  27324-0001

EXHIBIT A-1



EXHIBIT "A-2"

## INTENTIONALLY OMITTED

A-2

12187661v8 27324-0001



EXHIBIT "B"

## NON-FOREIGN AFFIDAVIT

The undersigned deponent (the "Deponent"), having personally appeared before the undersigned notary public and first having been duly sworn according to law, deposes and says under oath as follows:

1.      Deponent is presently a _____ of _____, a _____ ("Seller").

2.      In such capacity, the Deponent has personal knowledge of the facts sworn to in this affidavit and such facts are true and correct.

3.      Seller is the owner of certain real estate, a description of which is set forth on Exhibit A attached hereto and made a part hereof, together with all fixtures, improvements, easements and appurtenances related thereto (collectively, the "Property").

4.      Deponent understands that Section 1445 of the United States Internal Revenue Code of 1986 (as amended, the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a "foreign person" (as defined in the Code).  To inform [PURCHASER NAME: _____], [a _____] (the "Transferee") that withholding of tax is not required upon the disposition of a U.S. real property interest by the Seller, Deponent hereby certifies the following:

(a)      Seller is not a "non-resident alien" for purposes of United States income taxation or otherwise a "foreign person," as defined in Section 1445 of the Code.

(b)      Seller is not a disregarded entity as defined in Section 1.1445-2(b)(2)(iii) of the Income Tax Regulations issued under the Code.

(c)      Seller's United States taxpayer identification number is _____ .

(d)      The address (and, if different, the mailing address) of Seller is _____.

(e)      The Seller owns 100% of the aforesaid Property.

B-1

12187661v8 27324-0001

(f)    Deponent is making this Affidavit pursuant to the provisions of Section 1445 of the Code in connection with the conveyance of the real property described on Exhibit A, attached hereto and incorporated herein by reference, by the Seller to Transferee, which conveyance constitutes the disposition by the Seller of a United States real property interest, for the purpose of establishing that Transferee is not required to withhold tax pursuant to Section 1445 of the Code in connection with such disposition.

(g)    Deponent acknowledges that this Affidavit may be disclosed to the Internal Revenue Service by Transferee, that this Affidavit is made under penalty of perjury, and that any false statement made herein could be punished by fine, imprisonment or both.

5.    Under penalty of perjury, I declare that I have examined the foregoing Affidavit and hereby certify that it is true, correct and complete and I further declare that I have the authority to make this affidavit and the certifications contained herein on behalf of the Seller.

Certified, sworn to and subscribed before
me this ___ day of _____, 201_.


_____          _____
Notary Public                           Name: _____

My Commission Expires:


_____

(NOTARIAL SEAL)

B-2

EXHIBIT "C"

## FORM OF AFFIDAVIT OF SELLER'S RESIDENCE

## AFFIDAVIT OF SELLER'S RESIDENCE

_____          _____
Seller's Name                            Seller's Identification Number (SSN or FEI)

_____          _____
_____          Spouse's Identification Number (if jointly
_____          owned)
Street Address

Instructions

This form is provided to be executed by the seller and furnished to the buyer to establish Georgia residency, such that withholding from the proceeds of the sale of property are not subject to the withholding laws of this state (See O.C.G.A. §48-7-128.)

Sellers are not subject to withholding from the proceeds of sale if either they reside in Georgia, or they are deemed to be a Georgia resident by virtue of the fact that they have filed Georgia tax returns in the preceding two years, to business or own property in Georgia, intend to file a Georgia tax return for the current year, and, if a corporation or limited partnership, are registered to do business in this state.

Buyer is not required to withhold if this affidavit (or one in substantially the same form) is submitted to the Department in lieu of a withholding tax return.

The seller is to execute this affidavit by placing an initial in the blanks preceding statements which apply.

Seller is exempt from withholding on the sale of property because:

_____    Seller is a resident of Georgia.

Seller is not a resident of Georgia, but is deemed a resident for purposes of withholding by virtue of the following (all of the below must be met):

_____    Seller is a nonresident who has filed Georgia tax returns for the preceding two years; and

C-1

12187661v8  27324-0001

_____ Seller is an established business in Georgia and will continue substantially the same business in Georgia after the sale OR the seller has real property remaining in the state at the time of closing of equal or greater value than the withholding tax liability as measured by the 100% property tax assessment of such remaining property; and

_____ Seller will report the sale on a Georgia Income Tax return for the current year and file by its due date; and

_____ If seller is a corporation or limited partnership, seller is registered to do business in Georgia.

Under penalty of perjury, I swear that the above information is, to the best of my knowledge, and belief, true, correct, and complete.

_____    _____
Seller's signature (and Title, if applicable)    Date

_____    _____
Seller's signature (and Title, if applicable)    Date

Sworn to and subscribed before me this
_____ day of _____, 20____

_____
Notary Public

My commission expires_____

C-2

12187661v8 27324-0001

EXHIBIT "D"

## SELLER'S AFFIDAVIT REGARDING BROKERS

STATE OF _____

COUNTY OF _____

The undersigned deponent, _____ (the "Deponent"), having personally appeared before the undersigned notary public and first having been duly sworn according to law, deposes and says under oath as follows:

1.  Deponent is presently a _____ of _____, a _____(the "Seller").

2.  In such capacity, the Deponent has personal knowledge of the facts sworn to in this affidavit and such facts are true and correct.

3.  The Seller is the owner of certain real estate, a description of which is set forth on Exhibit A to that certain Deed executed as of even date herewith from Seller in favor of _____ ("Buyer") and made a part hereof (the "Property").  Seller has agreed to sell the Property to Buyer.

4.  Seller has not entered into any written agreement with, or otherwise engaged the services of, any commercial real estate broker for the payment of a real estate commission or fee relating to the purchase, sale, management, leasing or other licensed services pertaining to Commercial Real Estate (as defined in O.C.G.A. § 44-14-601(3)), and Seller has received no notice of any lien for any such services.  This Affidavit is given to induce a title insurance company to permit a policy or policies of title insurance to be issued without exception for any possible lien arising from the Commercial Real Estate Broker Lien Act (O.C.G.A. § 44-14-600 *et seq.*).

D-1

5.    This affidavit is made to induce Buyer to purchase the Property for the purchase price of $_____; to induce the title insurance company to issue its owner's policy insuring Buyer in the amount of said purchase price; and to induce the attorney certifying title so to certify.

Certified, sworn to and subscribed before
me this ___ day of _____, 201_.


_____          _____
Notary Public                    Name:_____

My Commission Expires:


_____

(NOTARIAL SEAL)

D-2

12187661v8 27324-0001

EXHIBIT "E"

## FORM OF LIMITED WARRANTY DEED

UPON RECORDING RETURN TO:

Miller & Martin PLLC
1170 Peachtree Street
Suite 800
Atlanta, Georgia  30309
Attention: Charles A. Brake, Esq.

## LIMITED WARRANTY DEED

STATE OF GEORGIA

COUNTY OF _____

        **THIS INDENTURE,** made as of the _____ day _____, 201___, between _____, a  (herein called "Grantor"), and _____, _____ _____(herein called "Grantee"), whose mailing address is _____ _____.

        **WITNESSETH:**  That Grantor, for the sum of Ten Dollars ($10.00) and other good and valuable consideration, in hand paid at and before the sealing and delivery of these presents, the receipt and sufficiency of which are hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed and by these presents does grant, bargain, sell, alien, convey and confirm unto Grantee all that tract or parcel of land described on Exhibit A, attached hereto and made a part hereof.

        **TO HAVE AND TO HOLD** the said bargained premises, together with all and singular the rights, members and appurtenances thereof, to the same being, belonging or in any wise appertaining, to the only proper use, benefit and behoof of Grantee, forever, **IN FEE SIMPLE**.

        This Deed and the warranty of title contained herein are made expressly subject to the list of permitted exceptions set forth on Exhibit B attached hereto and made a part hereof (collectively, the "Permitted Exceptions").

        Except as to any claims arising from or with respect to the Permitted Exceptions, Grantor will warrant and forever defend the right and title to the above described property unto Grantee against the lawful claims of all persons owning, holding or claiming by, through or under Grantor, but not otherwise.

E-1

12187661v8  27324-0001

(The words "Grantor" and "Grantee" include all genders, plural and singular, and their respective heirs, successors and assigns where the context requires or permits.)

**IN WITNESS WHEREOF**, Grantor has signed and sealed this deed, the day and year first above written.

Signed, sealed and delivered in the presence of:

_____, a

_____

_____
Unofficial Witness

By:_____

     Name: _____

_____
Notary Public

     Title: _____

Attest: _____

     (NOTARY SEAL)

     Name: _____

     Title: _____

My Commission Expires:

     [CORPORATE SEAL]

_____

E-2

12187661v8 27324-0001

## EXHIBIT A TO LIMITED WARRANTY DEED

## LEGAL DESCRIPTION

E-3

**EXHIBIT B TO LIMITED WARRANTY DEED**

**PERMITTED TITLE EXCEPTIONS**

E-4

12187661v8 27324-0001

EXHIBIT "F"

**FORM OF OPTION AGREEMENT**

12187661v8 27324-0001

## REAL ESTATE OPTION AGREEMENT

**THIS REAL ESTATE OPTION AGREEMENT** (the "Option") is made as of this ___ day of _____, 20__ (the "Effective Date") by and between AUDIA GROUP, LLC, A PENNSYLVANIA LIMITED LIABILITY COMPANY ("Buyer"), and WALKER COUNTY, GEORGIA and WALKER COUNTY DEVELOPMENT AUTHORITY (collectively, "Seller"). All capitalized terms not otherwise defined herein shall have the definitions set forth in that certain Agreement for Purchase and Sale of Property dated as of _____, 2014 between Buyer and Seller (the "Agreement").

W I T N E S S E T H   T H A T :

WHEREAS, Buyer has agreed to purchase, and Seller has agreed to sell, the Property upon the terms and conditions set forth in the Agreement.

WHEREAS, contemporaneous with and as a condition of its agreement to purchase the Property, Buyer also wishes to obtain an option to purchase the Option Property, and Seller has agreed to provide to Buyer an option to purchase the Option Property, on the terms and conditions set forth in the Agreement and in this Option.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.      Grant of Option.  In consideration of Buyer's purchase of the Property from Seller (the "Option Consideration"), Seller hereby grants to Buyer an exclusive option to purchase, upon the terms and conditions set forth in this Option, the Option Property, together with all improvements to be constructed by Seller pursuant to the terms of this Option and all easements, rights and privileges appurtenant thereto.

2.      Option Consideration and Option Purchase Price.  The purchase price for the Option Property is Ten and No/100s Dollars ($10.00) (the "Option Purchase Price"). The Option Purchase Price shall be paid by Buyer to Seller at the Option Closing in United States dollars, by wire transfer or other immediately funds.

3.      Exercise of Option.  This Option may be exercised by Buyer at any time on or before January 1, 2025 (the "Option Period") by delivery of written notice of such exercise to Seller in accordance with the requirements and terms of this Option, which notice shall specify a proposed Closing date which shall in no event be less than one hundred and twenty (120) days after the effective date of the notice unless otherwise agreed by Seller.  If not exercised by Buyer prior to the completion of the Option Period, upon expiration of the Option Period the Option will be deemed terminated and of no further force or effect.

12283091v6
27324-0001

4.    Conveyance.  At the Option Closing, Seller shall convey good and marketable fee simple title to the Option Property to Buyer free and clear of all liens and encumbrances (including, but not limited to, any loans secured by the Option Property), subject only to the Permitted Title Exceptions.  Seller shall remove any monetary liens against the Option Property at or before the Option Closing.  Seller agrees not to further alter or encumber or convey in any way Seller's title to the Option Property after the date of this Option without Buyer's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

5.    Documentation From Seller.  Prior to the date hereof, Seller has delivered to Buyer all of the items regarding the Option Property then in its possession or control set forth in Section 7.2 of the Agreement.  So long as this Option is in effect, to the extent that Seller shall receive or otherwise obtain possession or control of additional items regarding the Option Property described in Section 7.2 of the Agreement, or it shall receive updated or revised versions of any previously delivered items, Seller will promptly deliver to Buyer copies of such additional, updated or revised items.  Furthermore, so long as this Option is in effect, Seller will provide to Buyer such additional documentation or information regarding the Option Property which Buyer may reasonably request.

6.    Buyer's Inspection Rights.  So long as this Option is in effect, Buyer and its agents, employees, representatives and independent contractors are and have been entitled to enter upon the Option Property for the purpose of making such surveys, soil tests, borings, percolation tests, inspections, examinations, and studies as Buyer deems necessary or desirable in its sole discretion regarding the Option Property.  Buyer agrees to exercise such right in a manner that will not materially and adversely harm or damage the Option Property, or interfere with Seller's operations being conducted thereon.  Buyer agrees to restore the Option Property to their condition prior to any such work immediately after conducting the same.  Buyer hereby indemnifies and holds Seller harmless from and against any claims for injury or death to persons, damage to property or other losses, damages or claims, including, in each instance, reasonable attorneys' fees and litigation costs actually incurred, arising out of any action of any person or firm entering the Option Property on Buyer's behalf as aforesaid, which indemnity shall survive the Option Closing or any termination of this option; provided, however, this indemnity shall not apply to Buyer's mere discovery of any pre-existing condition (including, without limitation, any Hazardous Substances) at the Option Property.  Buyer's obligation to restore the Option Property as provided in this Section 6 shall survive any termination of this Option.

7.    Survey.    Seller has previously delivered to Buyer the Option Property Survey pursuant to Section 6 of the Agreement.  In the event Buyer exercises the Option, upon Buyer's reasonable request, Seller shall, at its expense, within thirty (30) days have the Option Property Survey updated, which updated Option Property Survey will comply with ALTA/ASCM minimum standards (an ALTA survey).  The legal description to the attached to the deed conveying the Option Property to Buyer shall be the legal description set forth in the most current Option Property Survey.

8.    Conditions Precedent for Buyer.  In addition to other conditions set forth in this Option for Buyer's benefit, upon Buyer's exercise of the Option  Buyer's obligation to purchase

2

12283091v6

27324-0001

the Option Property shall be subject to and contingent upon the following conditions precedent, any or all of which Buyer may waive by written notice only:

(a)    Adverse Conditions.    There shall be no material adverse change in the condition of or affecting the Option Property between the Effective Date and the Closing Date, including, but not limited to, (a) environmental contamination, (b) access, and (c) the availability, adequacy and cost of utilities;

(b)    Title Insurance.    The willingness of Title Insurer to issue, on the Closing Date, upon the sole condition of the payment of an amount no greater than its regularly scheduled premium and delivery of items required of Buyer, its standard ALTA form owner's policy of title insurance ("Title Policy"), insuring in the amount of at least $50,000,000 that title to the Option Property is vested of record in Buyer on the Closing Date, subject only to the Permitted Title Exceptions;

(c)    The Option Property Survey not disclosing any matters that are objectionable to Buyer in its sole discretion;

(d)    Representations and Warranties.    Seller's representations and warranties contained herein shall be true and correct as of the Effective Date and the Closing Date in all material respects.

(e)    Estoppel. Buyer shall have received an estoppel certificate from the appropriate Person with respect to any covenants, conditions, restrictions, or easements which affect the Option Property confirming (i) that the Option Property is not in default under any of such covenants, conditions, restrictions, or easements, (ii) that there are no past due amounts owed with respect to the Option Property, and (iii) addressing such other matters as Buyer may reasonably request.

(f)    Pad-Ready.    Seller shall have, at its expense, completed rendering the Option Property "pad-ready" by contractors approved by Buyer. As used herein, "pad-ready" means in a final condition upon which Buyer's contractors can commence construction of the current and future contemplated facilities on the Option Property, including without limitation (1) having the proposed facility locations (including all buildings and the trailer truck and automobile parking areas) as shown of the Buyer's site plan rough-graded and fine-graded, and meeting the soil compaction, soil composition, flatness and other specifications established by Buyer's general contractor or engineer; (2) proper storm water management facilities, including retention ponds, pellet separation systems, drainage connections (to be located within 5 feet of the proposed building location and the number of which to be determined by Buyer's general contractor), and loading dock drains, in place; (3) all required railway bed construction and ballasting for the railway service contemplated in Section 8(h) below completed and ready for installation of the contemplated rail spur, including rail track, switches and other equipment, (4) appropriate concrete foundation for truck docks to be located on the Option Property (if applicable); and (5) the topsoil scraped off and collected in an area determined by Buyer for subsequent use by Buyer's designated contractor in landscaping the Option Property.    In rendering the Option Property pad-ready, the contractor selected by Seller will consult with

3

Buyer and its general contractor and/or engineers to ensure the Option Property is prepared in a manner consistent with Buyer's construction plans. When Seller believes the Option Property is pad-ready, Seller will cause its engineer or contractor to certify to Buyer that the Option Property is pad-ready as defined herein. Buyer shall also have the right to inspect and test the Option Property, using such independent parties as it deems advisable, to confirm that it is pad-ready as defined herein. Seller will provide to Buyer update reports on a weekly basis, such reports to include pictures of the work completed and to be in a form mutually agreed upon by the parties. To the extent that, by agreement of the parties, Seller does not complete any portion of the foregoing work prior to the Closing, Seller shall remain obligated to complete such work (at its expense) post-Closing.

(g)     Water, Sewer, Electricity, Natural Gas, Etc. The Option Property shall have access to applicable permanent and temporary water lines (for both Buyer consumption and fire suppression systems) sewer lines (sanitary and storm water), electricity, natural gas lines, and telecommunication lines as prescribed in Section 7.3.7 of the Agreement.

(h)     Railway Service. Buyer continuing to retain from Chattooga & Chickamauga Railway and such other railway company acceptable to Buyer, a signed commitment to install on the Option Property rail spurs, including track, switches and other equipment, necessary to provide to the Option Property adequate rail service in Buyer's opinion to support its business operations.

(i)     Inspections; Safety Precautions; Erosion Control . So long as this Option is in force, Buyer shall be entitled to visit and inspect the Option Property and the pre-closing work to be performed by Seller, subject to Seller's established safety procedures. Seller will ensure that, in performing all of the various construction-related services required hereunder, all proper and legally–required erosion control and safety precautions are implemented, including proper barricading of all excavation and active construction sites. Seller shall also construct all temporary roadways necessary to complete the contemplated construction activities (both pre and post-closing), as well as to allow Buyer to inspect such work and the results thereof, and all required temporary walk-off, washout, and storage areas.

(j)     Failure of Condition(s) Precedent; Cancellation. If any of the foregoing conditions precedent in this Section 8 are not satisfied or waived in writing by Buyer, Buyer shall elect, at its option, by notice to Seller, either to: (1) terminate this Option, in which event the parties hereto shall have no further rights or obligations hereunder, except for those which expressly survive such termination; or (2) close without regard to the failure of such condition. If these conditions have not been satisfied within ninety (90) days after Buyer's delivery of notice of its intention to exercise the Option, within thirty (30) days thereafter, Buyer shall elect either option (a) or (b) by notice to Seller. If Buyer does not give any such notice to Seller, Buyer shall be deemed to have elected option (2).

9.     Representations and Warranties. Seller hereby reaffirms, as of the Effective Date, the warranties and representations to Buyer regarding Seller and the Option Property set forth in Section 8 of the Agreement. The warranties and representations reaffirmed in this Section 9 are true, correct and complete in all material respects, and shall be true correct and complete in all

4

material respects as of the Closing Date and shall survive the Option Closing for one (1) year and shall not be deemed merged into any instrument of conveyance delivered at the Option Closing, and shall inure to the benefit of and be enforceable by Buyer, its successors and assigns.

10.    Closing.

(a)    Time and Place.  Provided that all of the conditions set forth in this Option Agreement are theretofore fully satisfied or performed, the Option Closing shall be held at the office of Miller & Martin PLLC, at 10:00 a.m. local time, on a date selected by Buyer which shall be on or before the proposed Closing date specified by Buyer in the Option exercise notice provided by it pursuant to Section 3 above, unless the Option Closing Date is postponed pursuant to the express terms of this Option Agreement or as otherwise agreed by Seller and Buyer in writing.  If Buyer is not satisfied with the conditions precedent set forth in Section 8, Buyer may extend the Closing Date for up to sixty (60) days by giving written notice thereof to Seller. The parties agree to cooperate to close in escrow by mail if possible.

(b)    Closing Documents.  For and in consideration of, and as a condition precedent to Buyer's delivery to Seller of the Option Purchase Price, Seller shall obtain and deliver to Buyer at the Option Closing the following documents (all of which shall be duly executed and witnessed, which documents Buyer agrees to execute where required):

(1)  A limited warranty deed (the "Deed") conveying to Buyer all of Seller's right, title and interest in and to the Option Property, subject only to the Permitted Title Exceptions, in the form attached as Exhibit "E" to the Agreement and by this reference made a part hereof;

(2)  A Certificate and Affidavit of Non-Foreign Status in the form attached as Exhibit "B" to the Agreement  and by this reference made a part hereof;

(3)  An affidavit of title in the form reasonably required by the Title Insurer in order to issue its extended coverage owner's policy of title insurance without exception for mechanic's, materialmen's or other statutory liens, for unrecorded easements, for other rights of parties in possession or for other matters that are unacceptable to Buyer;

(4)  Such evidence as Title Insurer shall reasonably require as to the authority of the parties acting on behalf of Seller to enter into this Option Agreement and to discharge the obligations of Seller pursuant hereto;

(5)  A certificate of Seller, dated as of the Closing Date, reaffirming that all representations and warranties of Seller under this Option Agreement are true, correct and complete in all material respects as of the Option Closing Date which certificate shall survive the Option Closing for one (1) year.

(6)    A Closing Statement;

5

12283091v6
27324-0001

(7)     Such further instructions, documents and information as Buyer or Title Insurer may reasonably request to consummate the purchase and sale contemplated by this Option Agreement.

(8) An Affidavit of Seller's Residence in the form attached as <u>Exhibit "C"</u> to the Agreement and by this reference made a part hereof;

(9)  A Seller's Affidavit Regarding Brokers in the form attached hereto as <u>Exhibit "D"</u> to the Agreement and by this reference made a part hereof; and

(10)  At Closing, Seller will also deliver to Buyer all licenses, permits, plans, specifications, maps, plats, surveys, books and records in Seller's possession or control relating to the Option Property or to the operation or use thereof.

(c)     <u>Costs</u>.  At the Closing, Seller and Buyer shall pay their own respective costs incurred with respect to the consummation of the purchase and sale of the Option Property as contemplated herein, including, without limitation, attorneys' fees.  Notwithstanding the foregoing, it is expressly agreed that Seller shall pay the cost of any and all transfer and/or documentary stamp taxes (if any) incident to the conveyance of title to the Option Property to Buyer.  Buyer shall pay the cost of recording the deed, any title insurance commitment or title insurance policy that Buyer elects to obtain, and any costs, fees or expenses relating to Buyer's investigation of the Option Property.

<u>Section 10.</u>  <u>Environmental Indemnity</u>.  If the Closing occurs, Seller shall indemnify and hold harmless Buyer from any and all claims, losses, Liabilities, damages, deficiencies, diminution in value, costs, and expenses, including reasonable attorneys' fees and the expenses of investigation and defense (whether or not involving third party claims) incurred or sustained by Buyer, directly or indirectly, as a result of, in connection with or arising out of  (i) any violation or alleged violation of any Hazardous Substance Law with respect to the Option Property occurring on or before the Closing Date. This Section 10 shall expressly survive the Closing hereunder.

<u>Section 11.</u>  <u>Condemnation</u>.

(a)  <u>Condemnation</u>.  Upon becoming aware of the same, Seller agrees to give Buyer immediate written notice of any actual or threatened taking in condemnation or by eminent domain (or a sale in lieu thereof).  Between the Effective Date and the Closing Date, any actual or threatened taking or condemnation for any public or quasi-public purpose or use by any competent authority in appropriate proceedings or by any right of eminent domain of all or any part of the Option Property which would, in Buyer's judgment,  adversely affect the Option Property or render either unsuitable for Buyer's purposes, shall, at Buyer's option, allow Buyer, by written notice to Seller,  to elect to terminate this Agreement.  If this Agreement is so terminated, the parties shall have no further rights or obligations hereunder, except for those which expressly survive any such termination. Notwithstanding the foregoing, between the

6

12283091v6
27324-0001

Effective Date and the Closing Date, Seller agrees not to institute any taking in condemnation or by eminent domain (or a sale in lieu thereof) related to the Option Property.

(b)  Awards and Proceeds.  If Buyer does not elect to terminate this Agreement following any notice of a threat of taking or taking by condemnation, as provided above, this Agreement shall remain in full force and effect and the conveyance of the Option Property contemplated herein, less any interest taken by eminent domain or condemnation, or sale in lieu thereof, shall be effected.  At the Closing, Seller shall assign, transfer and set over to Buyer all of Seller's right, title and interest in and to any awards or payments for the actual value of the property lost or destroyed that have been or may thereafter be made for any such taking or sale in lieu thereof.

Section 12.  Assignment.  Buyer may assign any of Buyer's rights hereunder or any part thereof to an affiliate or subsidiary of Buyer or to an entity formed by Buyer for the purpose of taking title to the Option Property.  Otherwise, Buyer may not assign Buyer's rights hereunder or any part hereof without the Seller's prior written consent shall not be unreasonably withheld, conditioned or delayed.

Section 13.  Brokers.  Buyer and Seller each warrant and represent to the other that they have not employed and will not employ, a real estate broker or agent in connection with the transaction contemplated hereby.  Each party agrees to indemnify and hold the other harmless from any loss or cost suffered or incurred by it as a result of the other's representation herein being untrue.  This Section 13 shall expressly survive the Closing hereunder.

Section 14.  Notices.  Wherever any notice or other communication is required or permitted hereunder, such notice or other communication shall be in writing and shall be delivered by hand, by nationally-recognized overnight express delivery service, by U. S. registered or certified mail, return receipt requested, postage prepaid, or by email,  to the addresses set out below or at such other addresses as are specified by written notice delivered in accordance herewith:

> BUYER:  Audia Group LLC
> 450 Racetrack Road
> Washington, Pennsylvania 15301
> Attention:  A. Richard Violi, Esq.
> Phone No.:  (724) 745-0588
> Email: violi@audiagroup.com

> With a copy to:  Miller & Martin PLLC
> 1180 W. Peachtree Street NW
> Suite 2100
> Atlanta, Georgia 30309
> Attention:  Charles A. Brake, Esq.
> Phone No.: (404) 962-6436
> Email:  cbrake@millermartin.com

12283091v6
27324-0001



SELLER: _____
           _____
           _____
           Attention:_____
           Phone No.:_____
           Email:_____

With a copy to: _____
               _____
               _____
               Attention:_____
               Phone No.:_____
               Email:_____

Any notice or other communication mailed as hereinabove provided shall be deemed effectively given (a) on the date of delivery, if delivered by hand; (b) on the date delivered if sent by overnight express delivery or if sent by U.S. mail; or (c) on the date of transmission, if sent by email. Such notices shall be deemed received (a) on the date of delivery, if delivered by hand or overnight express delivery service; (b) on the date indicated on the return receipt if mailed; or (c) on the date of transmission, if sent by email. If any notice mailed is properly addressed but returned because of a change of address for which no prior written notice was properly given, such notice shall be deemed to be effective notice and to be given on the date of mailing. If any notice is properly sent to an email address but returned because of a change of email address for which no prior written notice was properly given, such notice shall be deemed to be effective notice and to be given on the date the email was sent.

Section 15. Miscellaneous.

(a) Governing Law; Headings; Rules of Construction. This Agreement shall be construed and interpreted under the laws of Georgia. The titles of sections and subsections herein have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions herein. All references herein to the singular shall include the plural, and vice versa. The parties agree that this Agreement is the result of negotiation by the parties, each of whom was represented by counsel, and thus, this Agreement shall not be construed against the maker thereof.

(b) No Waiver. Neither the failure of either party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with its obligations hereunder, nor any custom or practice of the parties at variance with the terms hereof shall constitute a waiver of either party's right to demand exact compliance with the terms hereof.

(c) Entire Agreement. This Agreement and the documents incorporated herein by reference contain the entire agreement of the parties hereto with respect to the Option

8

Property, and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein or incorporated herein by reference shall be of any force or effect.

(d) <u>Binding Effect</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective personal representatives, successors and assigns.

(e) <u>Amendments</u>.  No amendment to this Agreement shall be binding on any of the parties hereto unless such amendment is in writing and is executed by the party against whom enforcement of such amendment is sought.

(f) <u>Possession</u>.  Possession of the Option Property shall be granted by Seller to Buyer no later than the Closing Date, subject to the Permitted Title Exceptions.

(g) <u>Date for Performance</u>.  If the time period by which any right, option or election provided under this Agreement must be exercised, or by which any act required hereunder must be performed, or by which the Closing must be held, expires on a day other than a Business Day, then such time period shall be automatically extended through the close of business on the next regularly scheduled Business Day.

(h) Reserved

(i) <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which, when taken together, shall constitute but one and the same instrument. The parties agree to accept emailed copies of executed signature pages to this Agreement and to treat the same as originals. To the extent emailed copies of signature pages are used, upon request, the parties agree to exchange original signature pages promptly after the Effective Date.

(j) <u>Time of the Essence</u>.  Time shall be of the essence of this Agreement and each and every term and condition hereof.

(k) <u>Severability</u>.  This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations, and is intended, and shall for all purposes be deemed to be, a single, integrated document setting forth all of the agreements and understandings of the parties hereto, and superseding all prior negotiations, understandings and agreements of such parties.  If any term or provision of this Agreement or the application thereof to any person or circumstance shall for any reason and to any extent be held to be invalid or unenforceable, then such term or provision shall be ignored, and to the maximum extent possible, this Agreement shall continue in full force and effect, but without giving effect to such term or provision.

(l) <u>Listings and Other Offers</u>.  During the pendency of this Agreement, Seller shall not list the Option Property with any broker or otherwise solicit any offers to sell the Option Property or enter into any binding contracts or binding agreements regarding any disposition of the Option Property.

9

(m)   Attorney's Fees.  In the event a dispute arises between Buyer and Seller under this Agreement, the losing party shall pay the attorney's fees and court costs of the prevailing party.

IN WITNESS WHEREOF, each of the parties hereto has duly signed and sealed this Agreement, effective as of the day and year first above written.

SELLER:

WALKER COUNTY, GEORGIA

By:_____
Name:_____
Title:_____

Attest:_____
Name:_____
Title:_____

[Corporate Seal]

WALKER COUNTY DEVELOPMENT AUTHORITY

By:_____
Name:_____
Title:_____

Attest:_____
Name:_____
Title:_____

10

12283091v6
27324-0001

[Corporate Seal]

11

12283091v6
27324-0001

<u>BUYER:</u>

AUDIA GROUP, LLC

By:_____
Name:_____
Title:_____


Attest:_____
Name:_____
Title:_____


[Corporate Seal]

12

## REAL ESTATE OPTION AGREEMENT

THIS REAL ESTATE OPTION AGREEMENT (the "Option") is made as of this _10th_ day of _September_, 20_14_ (the "Effective Date") by and between AUDIA GROUP, LLC, A PENNSYLVANIA LIMITED LIABILITY COMPANY ("Buyer"), and WALKER COUNTY, GEORGIA and WALKER COUNTY DEVELOPMENT AUTHORITY (collectively, "Seller"). All capitalized terms not otherwise defined herein shall have the definitions set forth in that certain Agreement for Purchase and Sale of Property dated as of _9/10/14_, 2014 between Buyer and Seller (the "Agreement").

## W I T N E S S E T H   T H A T :

WHEREAS, Buyer has agreed to purchase, and Seller has agreed to sell, the Property upon the terms and conditions set forth in the Agreement.

WHEREAS, contemporaneous with and as a condition of its agreement to purchase the Property, Buyer also wishes to obtain an option to purchase the Option Property, and Seller has agreed to provide to Buyer an option to purchase the Option Property, on the terms and conditions set forth in the Agreement and in this Option.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.    Grant of Option. In consideration of Buyer's purchase of the Property from Seller (the "Option Consideration"), Seller hereby grants to Buyer an exclusive option to purchase, upon the terms and conditions set forth in this Option, the Option Property, together with all improvements to be constructed by Seller pursuant to the terms of this Option and all easements, rights and privileges appurtenant thereto.

2.    Option Consideration and Option Purchase Price. The purchase price for the Option Property is Ten and No/100s Dollars ($10.00) (the "Option Purchase Price"). The Option Purchase Price shall be paid by Buyer to Seller at the Option Closing in United States dollars, by wire transfer or other immediately funds.

3.    Exercise of Option. This Option may be exercised by Buyer at any time on or before January 1, 2025 (the "Option Period") by delivery of written notice of such exercise to Seller in accordance with the requirements and terms of this Option, which notice shall specify a proposed Closing date which shall in no event be less than one hundred and twenty (120) days after the effective date of the notice unless otherwise agreed by Seller. If not exercised by Buyer prior to the completion of the Option Period, upon expiration of the Option Period the Option will be deemed terminated and of no further force or effect.

12283991v6
27324-0001

4.      Conveyance.  At the Option Closing, Seller shall convey good and marketable fee simple title to the Option Property to Buyer free and clear of all liens and encumbrances (including, but not limited to, any loans secured by the Option Property), subject only to the Permitted Title Exceptions.  Seller shall remove any monetary liens against the Option Property at or before the Option Closing.  Seller agrees not to further alter or encumber or convey in any way Seller's title to the Option Property after the date of this Option without Buyer's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

5.      Documentation From Seller.  Prior to the date hereof, Seller has delivered to Buyer all of the items regarding the Option Property then in its possession or control set forth in Section 7.2 of the Agreement.  So long as this Option is in effect, to the extent that Seller shall receive or otherwise obtain possession or control of additional items regarding the Option Property described in Section 7.2 of the Agreement, or it shall receive updated or revised versions of any previously delivered items, Seller will promptly deliver to Buyer copies of such additional, updated or revised items.  Furthermore, so long as this Option is in effect, Seller will provide to Buyer such additional documentation or information regarding the Option Property which Buyer may reasonably request.

6.      Buyer's Inspection Rights..  So long as this Option is in effect, Buyer and its agents, employees, representatives and independent contractors are and have been entitled to enter upon the Option Property for the purpose of making such surveys, soil tests, borings, percolation tests, inspections, examinations, and studies as Buyer deems necessary or desirable in its sole discretion regarding the Option Property.  Buyer agrees to exercise such right in a manner that will not materially and adversely harm or damage the Option Property, or interfere with Seller's operations being conducted thereon.  Buyer agrees to restore the Option Property to their condition prior to any such work immediately after conducting the same.  Buyer hereby indemnifies and holds Seller harmless from and against any claims for injury or death to persons, damage to property or other losses, damages or claims, including, in each instance, reasonable attorneys' fees and litigation costs actually incurred, arising out of any action of any person or firm entering the Option Property on Buyer's behalf as aforesaid, which indemnity shall survive the Option Closing or any termination of this option; provided, however, this indemnity shall not apply to Buyer's mere discovery of any pre-existing condition (including, without limitation, any Hazardous Substances) at the Option Property.  Buyer's obligation to restore the Option Property as provided in this Section 6 shall survive any termination of this Option.

7.      Survey.      Seller has previously delivered to Buyer the Option Property Survey pursuant to Section 6 of the Agreement.  In the event Buyer exercises the Option, upon Buyer's reasonable request, Seller shall, at its expense, within thirty (30) days have the Option Property Survey updated, which updated Option Property Survey will comply with ALTA/ASCM minimum standards (an ALTA survey).  The legal description to the attached to the deed conveying the Option Property to Buyer shall be the legal description set forth in the most current Option Property Survey.

8.      Conditions Precedent for Buyer.  In addition to other conditions set forth in this Option for Buyer's benefit, upon Buyer's exercise of the Option  Buyer's obligation to purchase

2

12283091v6
27324-0001

the Option Property shall be subject to and contingent upon the following conditions precedent, any or all of which Buyer may waive by written notice only:

(a)    Adverse Conditions.  There shall be no material adverse change in the condition of or affecting the Option Property between the Effective Date and the Closing Date, including, but not limited to, (a) environmental contamination, (b) access, and (c) the availability, adequacy and cost of utilities;

(b)    Title Insurance.  The willingness of Title Insurer to issue, on the Closing Date, upon the sole condition of the payment of an amount no greater than its regularly scheduled premium and delivery of items required of Buyer, its standard ALTA form owner's policy of title insurance ("Title Policy"), insuring in the amount of at least $50,000,000 that title to the Option Property is vested of record in Buyer on the Closing Date, subject only to the Permitted Title Exceptions;

(c)    The Option Property Survey not disclosing any matters that are objectionable to Buyer in its sole discretion;

(d)    Representations and Warranties.  Seller's representations and warranties contained herein shall be true and correct as of the Effective Date and the Closing Date in all material respects.

(e)    Estoppel. Buyer shall have received an estoppel certificate from the appropriate Person with respect to any covenants, conditions, restrictions, or easements which affect the Option Property confirming (i) that the Option Property is not in default under any of such covenants, conditions, restrictions, or easements, (ii) that there are no past due amounts owed with respect to the Option Property, and (iii) addressing such other matters as Buyer may reasonably request.

(f)    Pad-Ready.  Seller shall have, at its expense, completed rendering the Option Property "pad-ready" by contractors approved by Buyer. As used herein, "pad-ready" means in a final condition upon which Buyer's contractors can commence construction of the current and future contemplated facilities on the Option Property, including without limitation (1) having the proposed facility locations (including all buildings and the trailer truck and automobile parking areas) as shown of the Buyer's site plan rough-graded and fine-graded, and meeting the soil compaction, soil composition, flatness and other specifications established by Buyer's general contractor or engineer; (2) proper storm water management facilities, including retention ponds, pellet separation systems, drainage connections (to be located within 5 feet of the proposed building location and the number of which to be determined by Buyer's general contractor), and loading dock drains, in place; (3) all required railway bed construction and ballasting for the railway service contemplated in Section 8(h) below completed and ready for installation of the contemplated rail spur, including rail track, switches and other equipment, (4) appropriate concrete foundation for truck docks to be located on the Option Property (if applicable); and (5) the topsoil scraped off and collected in an area determined by Buyer for subsequent use by Buyer's designated contractor in landscaping the Option Property.   In rendering the Option Property pad-ready, the contractor selected by Seller will consult with

3

12283091v6
27324-0001

Buyer and its general contractor and/or engineers to ensure the Option Property is prepared in a manner consistent with Buyer's construction plans. When Seller believes the Option Property is pad-ready, Seller will cause its engineer or contractor to certify to Buyer that the Option Property is pad-ready as defined herein. Buyer shall also have the right to inspect and test the Option Property, using such independent parties as it deems advisable, to confirm that it is pad-ready as defined herein. Seller will provide to Buyer update reports on a weekly basis, such reports to include pictures of the work completed and to be in a form mutually agreed upon by the parties. To the extent that, by agreement of the parties, Seller does not complete any portion of the foregoing work prior to the Closing, Seller shall remain obligated to complete such work (at its expense) post-Closing.

(g)    Water, Sewer, Electricity, Natural Gas, Etc.    The Option Property shall have access to applicable permanent and temporary water lines (for both Buyer consumption and fire suppression systems) sewer lines (sanitary and storm water), electricity, natural gas lines, and telecommunication lines as prescribed in Section 7.3.7 of the Agreement.

(h)    Railway Service. Buyer continuing to retain from Chattooga & Chickamauga Railway and such other railway company acceptable to Buyer, a signed commitment to install on the Option Property rail spurs, including track, switches and other equipment, necessary to provide to the Option Property adequate rail service in Buyer's opinion to support its business operations.

(i)    Inspections; Safety Precautions; Erosion Control .    So long as this Option is in force, Buyer shall be entitled to visit and inspect the Option Property and the pre-closing work to be performed by Seller, subject to Seller's established safety procedures. Seller will ensure that, in performing all of the various construction-related services required hereunder, all proper and legally–required erosion control and safety precautions are implemented, including proper barricading of all excavation and active construction sites. Seller shall also construct all temporary roadways necessary to complete the contemplated construction activities (both pre and post-closing), as well as to allow Buyer to inspect such work and the results thereof, and all required temporary walk-off, washout, and storage areas.

(j)    Failure of Condition(s) Precedent; Cancellation.    If any of the foregoing conditions precedent in this Section 8 are not satisfied or waived in writing by Buyer, Buyer shall elect, at its option, by notice to Seller, either to: (1) terminate this Option, in which event the parties hereto shall have no further rights or obligations hereunder, except for those which expressly survive such termination; or (2) close without regard to the failure of such condition. If these conditions have not been satisfied within ninety (90) days after Buyer's delivery of notice of its intention to exercise the Option, within thirty (30) days thereafter, Buyer shall elect either option (a) or (b) by notice to Seller. If Buyer does not give any such notice to Seller, Buyer shall be deemed to have elected option (2).

9.    Representations and Warranties. Seller hereby reaffirms, as of the Effective Date, the warranties and representations to Buyer regarding Seller and the Option Property set forth in Section 8 of the Agreement. The warranties and representations reaffirmed in this Section 9 are true, correct and complete in all material respects, and shall be true correct and complete in all

4

12283091v6
27324-0001

material respects as of the Closing Date and shall survive the Option Closing for one (1) year and shall not be deemed merged into any instrument of conveyance delivered at the Option Closing, and shall inure to the benefit of and be enforceable by Buyer, its successors and assigns.

10.    Closing.

(a)    Time and Place.  Provided that all of the conditions set forth in this Option Agreement are theretofore fully satisfied or performed, the Option Closing shall be held at the office of Miller & Martin PLLC, at 10:00 a.m. local time, on a date selected by Buyer which shall be on or before the proposed Closing date specified by Buyer in the Option exercise notice provided by it pursuant to Section 3 above, unless the Option Closing Date is postponed pursuant to the express terms of this Option Agreement or as otherwise agreed by Seller and Buyer in writing.  If Buyer is not satisfied with the conditions precedent set forth in Section 8, Buyer may extend the Closing Date for up to sixty (60) days by giving written notice thereof to Seller. The parties agree to cooperate to close in escrow by mail if possible.

(b)  Closing Documents.   For and in consideration of, and as a condition precedent to Buyer's delivery to Seller of the Option Purchase Price, Seller shall obtain and deliver to Buyer at the Option Closing the following documents (all of which shall be duly executed and witnessed, which documents Buyer agrees to execute where required):

(1)   A limited warranty deed (the "Deed") conveying to Buyer all of Seller's right, title and interest in and to the Option Property, subject only to the Permitted Title Exceptions, in the form attached as Exhibit "E" to the Agreement and by this reference made a part hereof;

(2) A Certificate and Affidavit of Non-Foreign Status in the form attached as Exhibit "B" to the Agreement  and by this reference made a part hereof;

(3)   An affidavit of title in the form reasonably required by the Title Insurer in order to issue its extended coverage owner's policy of title insurance without exception for mechanic's, materialmen's or other statutory liens, for unrecorded easements, for other rights of parties in possession or for other matters that are unacceptable to Buyer;

(4)   Such evidence as Title Insurer shall reasonably require as to the authority of the parties acting on behalf of Seller to enter into this Option Agreement and to discharge the obligations of Seller pursuant hereto;

(5) A certificate of Seller, dated as of the Closing Date, reaffirming that all representations and warranties of Seller under this Option Agreement are true, correct and complete in all material respects as of the Option Closing Date which certificate shall survive the Option Closing for one (1) year.

(6)    A Closing Statement;

5

12283091v6
27324-0001

(7)    Such further instructions, documents and information as Buyer or Title Insurer may reasonably request to consummate the purchase and sale contemplated by this Option Agreement.

(8) An Affidavit of Seller's Residence in the form attached as Exhibit "C" to the Agreement and by this reference made a part hereof;

(9) A Seller's Affidavit Regarding Brokers in the form attached hereto as Exhibit "D" to the Agreement and by this reference made a part hereof; and

(10)   At Closing, Seller will also deliver to Buyer all licenses, permits, plans, specifications, maps, plats, surveys, books and records in Seller's possession or control relating to the Option Property or to the operation or use thereof.

(c)    Costs.  At the Closing, Seller and Buyer shall pay their own respective costs incurred with respect to the consummation of the purchase and sale of the Option Property as contemplated herein, including, without limitation, attorneys' fees.  Notwithstanding the foregoing, it is expressly agreed that Seller shall pay the cost of any and all transfer and/or documentary stamp taxes (if any) incident to the conveyance of title to the Option Property to Buyer.  Buyer shall pay the cost of recording the deed, any title insurance commitment or title insurance policy that Buyer elects to obtain, and any costs, fees or expenses relating to Buyer's investigation of the Option Property.

Section 10.  Environmental Indemnity.  If the Closing occurs, Seller shall indemnify and hold harmless Buyer from any and all claims, losses, Liabilities, damages, deficiencies, diminution in value, costs, and expenses, including reasonable attorneys' fees and the expenses of investigation and defense (whether or not involving third party claims) incurred or sustained by Buyer, directly or indirectly, as a result of, in connection with or arising out of  (i) any violation or alleged violation of any Hazardous Substance Law with respect to the Option Property occurring on or before the Closing Date. This Section 10 shall expressly survive the Closing hereunder.

Section 11.  Condemnation.

(a)  Condemnation.  Upon becoming aware of the same, Seller agrees to give Buyer immediate written notice of any actual or threatened taking in condemnation or by eminent domain (or a sale in lieu thereof). Between the Effective Date and the Closing Date, any actual or threatened taking or condemnation for any public or quasi-public purpose or use by any competent authority in appropriate proceedings or by any right of eminent domain of all or any part of the Option Property which would, in Buyer's judgment,  adversely affect the Option Property or render either unsuitable for Buyer's purposes, shall, at Buyer's option, allow Buyer, by written notice to Seller,  to elect to terminate this Agreement.  If this Agreement is so terminated, the parties shall have no further rights or obligations hereunder, except for those which expressly survive any such termination. Notwithstanding the foregoing, between the

6

12283091v6
27324-0001

Case 4:26-cv-00072-WMR    Document 1-4    Filed 03/27/26    Page 63 of 68

Effective Date and the Closing Date, Seller agrees not to institute any taking in condemnation or by eminent domain (or a sale in lieu thereof) related to the Option Property.

(b) Awards and Proceeds. If Buyer does not elect to terminate this Agreement following any notice of a threat of taking or taking by condemnation, as provided above, this Agreement shall remain in full force and effect and the conveyance of the Option Property contemplated herein, less any interest taken by eminent domain or condemnation, or sale in lieu thereof, shall be effected. At the Closing, Seller shall assign, transfer and set over to Buyer all of Seller's right, title and interest in and to any awards or payments for the actual value of the property lost or destroyed that have been or may thereafter be made for any such taking or sale in lieu thereof.

Section 12. Assignment. Buyer may assign any of Buyer's rights hereunder or any part thereof to an affiliate or subsidiary of Buyer or to an entity formed by Buyer for the purpose of taking title to the Option Property. Otherwise, Buyer may not assign Buyer's rights hereunder or any part hereof without the Seller's prior written consent shall not be unreasonably withheld, conditioned or delayed.

Section 13. Brokers. Buyer and Seller each warrant and represent to the other that they have not employed and will not employ, a real estate broker or agent in connection with the transaction contemplated hereby. Each party agrees to indemnify and hold the other harmless from any loss or cost suffered or incurred by it as a result of the other's representation herein being untrue. This Section 13 shall expressly survive the Closing hereunder.

Section 14. Notices. Wherever any notice or other communication is required or permitted hereunder, such notice or other communication shall be in writing and shall be delivered by hand, by nationally-recognized overnight express delivery service, by U. S. registered or certified mail, return receipt requested, postage prepaid, or by email, to the addresses set out below or at such other addresses as are specified by written notice delivered in accordance herewith:

BUYER:

Audia Group LLC
450 Racetrack Road
Washington, Pennsylvania 15301
Attention: A. Richard Violi, Esq.
Phone No.: (724) 745-0588
Email: violi@audiagroup.com

With a copy to:

Miller & Martin PLLC
1180 W. Peachtree Street NW
Suite 2100
Atlanta, Georgia 30309
Attention: Charles A. Brake, Esq.
Phone No.: (404) 962-6436
Email: cbrake@millermartin.com

7

12283091v6
27324-0001

SELLER:    Walker County
           P.O. Box 445
           101 South Duke Street Lafayette, GA 30728
           Attention: Bebe Heiskell
           Phone No.: 706-638-1437
           Email: commissioner@walkerga.us

With a copy to:    Walker County Development Authority
                   P.O. Box 445
                   101 South Duke Street Lafayette, GA 30728
                   Attention: Larry Brooks
                   Phone No.: 706-638-1437
                   Email: L.brooks@walkerga.us

Any notice or other communication mailed as hereinabove provided shall be deemed effectively given (a) on the date of delivery, if delivered by hand; (b) on the date delivered if sent by overnight express delivery or if sent by U.S. mail; or (c) on the date of transmission, if sent by email. Such notices shall be deemed received (a) on the date of delivery, if delivered by hand or overnight express delivery service; (b) on the date indicated on the return receipt if mailed; or (c) on the date of transmission, if sent by email. If any notice mailed is properly addressed but returned because of a change of address for which no prior written notice was properly given, such notice shall be deemed to be effective notice and to be given on the date of mailing. If any notice is properly sent to an email address but returned because of a change of email address for which no prior written notice was properly given, such notice shall be deemed to be effective notice and to be given on the date the email was sent.

Section 15. Miscellaneous.

(a) Governing Law; Headings; Rules of Construction. This Agreement shall be construed and interpreted under the laws of Georgia. The titles of sections and subsections herein have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions herein. All references herein to the singular shall include the plural, and vice versa. The parties agree that this Agreement is the result of negotiation by the parties, each of whom was represented by counsel, and thus, this Agreement shall not be construed against the maker thereof.

(b) No Waiver. Neither the failure of either party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with its obligations hereunder, nor any custom or practice of the parties at variance with the terms hereof shall constitute a waiver of either party's right to demand exact compliance with the terms hereof.

(c) Entire Agreement. This Agreement and the documents incorporated herein by reference contain the entire agreement of the parties hereto with respect to the Option Property,

8

12283091v6
27324-0001

and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein or incorporated herein by reference shall be of any force or effect.

(d)  Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective personal representatives, successors and assigns.

(e)  Amendments.  No amendment to this Agreement shall be binding on any of the parties hereto unless such amendment is in writing and is executed by the party against whom enforcement of such amendment is sought.

(f)  Possession.  Possession of the Option Property shall be granted by Seller to Buyer no later than the Closing Date, subject to the Permitted Title Exceptions.

(g)  Date for Performance.  If the time period by which any right, option or election provided under this Agreement must be exercised, or by which any act required hereunder must be performed, or by which the Closing must be held, expires on a day other than a Business Day, then such time period shall be automatically extended through the close of business on the next regularly scheduled Business Day.

(h)  Reserved

(i)  Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which, when taken together, shall constitute but one and the same instrument. The parties agree to accept emailed copies of executed signature pages to this Agreement and to treat the same as originals. To the extent emailed copies of signature pages are used, upon request, the parties agree to exchange original signature pages promptly after the Effective Date.

(j)  Time of the Essence.  Time shall be of the essence of this Agreement and each and every term and condition hereof.

(k)  Severability.  This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations, and is intended, and shall for all purposes be deemed to be, a single, integrated document setting forth all of the agreements and understandings of the parties hereto, and superseding all prior negotiations, understandings and agreements of such parties.  If any term or provision of this Agreement or the application thereof to any person or circumstance shall for any reason and to any extent be held to be invalid or unenforceable, then such term or provision shall be ignored, and to the maximum extent possible, this Agreement shall continue in full force and effect, but without giving effect to such term or provision.

(l)  Listings and Other Offers.  During the pendency of this Agreement, Seller shall not list the Option Property with any broker or otherwise solicit any offers to sell the Option Property or enter into any binding contracts or binding agreements regarding any disposition of the Option Property.

9

12283091v6
27324-0001

(m)    Attorney's Fees.    In the event a dispute arises between Buyer and Seller under this Agreement, the losing party shall pay the attorney's fees and court costs of the prevailing party.

IN WITNESS WHEREOF, each of the parties hereto has duly signed and sealed this Agreement, effective as of the day and year first above written.

SELLER:

WALKER COUNTY, GEORGIA

By: _Bebe Heiskell_
Name: _Bebe Heiskell_
Title: _Sole Commissioner_

Attest: _Pamela_
Name: _Pamela D Townsend_
Title: _Notary_

[Corporate Seal]

WALKER COUNTY DEVELOPMENT AUTHORITY

By: _Alvin M Hutchison Jr_
Name: _Alvin M Hutchison Jr_
Title: _Chairman_

Attest: _Pamela_
Name: _Pamela D_
Title: _Notary Public_

10

12283091v6
27324-0001

[Corporate Seal]

11

12283091v6
27324-0001

BUYER:

AUDIA GROUP, LLC

By: _____

Name: RICHARD V. OL.

Title: VICE PRESIDENT & GENERAL COUNSEL

Attest: _____

Name: JAMES TODD GUMMERSBACL

Title: DIRECTOR


[Corporate Seal]

12

12283091v6
27324-0001